UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

ARTHUR J. LONG,             )
                                       )
             Plaintiff,       )
                                       )
        v.                  )      2:15-cv-00291-JAW
                                       )
OFFICER BRENT D. ABBOTT, et al., )
                                       )
            Defendants.    )

**SUMMARY JUDGMENT ORDER**

The Plaintiff brings a 42 U.S.C. § 1983 claim against an officer of the Portland Police Department (PPD) alleging various constitutional violations associated with his arrest on August 9, 2014. The Plaintiff also asserts tort claims of assault and unlawful arrest against the officer under Maine state law. Additionally, the Plaintiff brings suit against the chief of the PPD and the city of Portland under the theories of supervisory and municipal liability, respectively.

Acting on the Defendants' motion for summary judgment, the Court concludes that there are no genuine issues of material fact on the claims against the chief of the PPD and the city of Portland and that they are entitled to judgment as a matter of law. The Court determines that the Maine Tort Claims Act (MTCA) bars the Plaintiff's state law claims against the officer because the Plaintiff failed to give timely notice of his claims under the statute. However, the Court concludes that genuine disputes of material fact preclude summary judgment on the Plaintiff's

constitutional claims against the officer and that qualified immunity does not bar the Plaintiff's suit on those claims.

## I.   PROCEDURAL POSTURE

### A.   Pleadings

On July 22, 2015, Arthur J. Long brought suit against (1) the city of Portland, Maine; (2) James Craig, the chief of the PPD; and (3) Brent Abbott, an officer with the PPD.[1]  *Compl. and Demand for Jury Trial* (ECF No. 1) (*Compl.*).  The following day, Mr. Long filed an amended complaint that corrected minor typographical errors. *First Am. Compl. and Demand for Jury Trial* (ECF No. 3).  On August 21, 2015, Mr. Long amended his complaint a second time to substitute Michael Sauschuck for James Craig as the chief of the PPD.  *Second Am. Compl. and Demand for Jury Trial* (ECF No. 4).   The city of Portland, Chief Sauschuck, and Officer Abbott (the Defendants) filed an answer on October 9, 2015.  *Answer, Aff'tive Defenses and Jury Trial Demand* (ECF No. 8).

On December 8, 2015, Mr. Long moved to amend his second amended complaint, *Assented to Mot. to File Third Am. Compl.* (ECF No. 13), and prospectively filed the third amended complaint with the Court.  *Third Am. Compl. and Demand for Jury Trial* (ECF No. 14).  The Court granted the motion without objection on December 9, 2015. *Order Granting Without Obj. Mot. to Amend* (ECF No. 15).  The

---

[1]      The original complaint referred to the Portland police officer as "Officer Abbott."  *Compl.* at 1. Mr. Long identified the officer as "Officer Brent Abbott" in his third amended complaint.  *See Third Am. Compl. and Demand for Jury Trial* at 1 (ECF No. 14).

Defendants answered on December 18, 2015. *Answer and Aff'tive Defenses to Third Am. Compl. and Jury Trial Demand* (ECF No. 16).

On April 12, 2016, Mr. Long moved to amend his third amended complaint. *Mot. to File Am. Compl.* (ECF No. 22). The Defendants objected on May 2, 2016. *Defs.' Obj. to Pl.'s Mot. to File Am. Compl.* (ECF No. 23). Mr. Long replied the following day. *Reply Mem. Supporting Mot. to File Third Am. Compl.* (ECF No. 24). On May 16, 2016, the Court granted the motion to amend. *Oral Order Granting Mot. to Am. Compl.* (ECF No. 27). Mr. Long filed the Fourth Amended Complaint on May 17, 2016. *Fourth (*and last*) Am. Compl. and Demand for Jury Trial* (ECF No. 28) (*Fourth Am. Compl.*). The Defendants answered on May 25, 2016. *Answer and Aff'tive Defenses to Fourth Am. Compl. and Jury Trial Demand* (ECF No. 29) (*Answer*).

**B.    Summary Judgment Filings**

On June 15, 2016, the Defendants moved for summary judgment on all counts in Mr. Long's Fourth Amended Complaint, *Defs.' Mot. for Summ. J.* (ECF No. 30) (*Defs.' Mot.*), and provided a supporting statement of material facts. *Defs.' Statement of Material Facts in Supp. of Mot. for Summ. J.* (ECF No. 31) (DSMF). Mr. Long opposed the Defendants' motion on July 6, 2016. *Pl.'s Opp'n to Defs.' Mot. for Summ. J.* (*Pl.'s Resp.*). Mr. Long also submitted a response to the Defendants' statement of material facts, *Pl.'s Opp'n*, Attach. 1, *Pl.'s Resp. to Defs.' Statement of Material Facts and Pl.'s Statement of Fact* at 1–21 (ECF No. 35) (PRDSMF), as well as a statement of additional material facts. *Id.* at 21–39 (PSAMF). On August 10, 2016, the

3

Defendants replied to Mr. Long's opposition. *Defs.' Reply in Supp. of Mot. for Summ. J.* (ECF No. 40). The Defendants also filed a reply to Mr. Long's statement of additional materials facts. *Defs.' Resp. to Pl.'s Statement of Additional Facts* (ECF No. 41) (DRPSAMF).

## II.   SUMMARY JUDGMENT FACTS

### A.   Arthur J. Long

Arthur J. Long, the Plaintiff in this case, lived in Portland, Maine, from his birth until his twenties. PSAMF ¶ 12; DRPSAMF ¶ 12. He last lived in Portland on a regular basis in 1978. PSAMF ¶ 13; DRPSAMF ¶ 13. From 1972 to 1978, Mr. Long worked as a reserve officer for the Portland Police Department. PSAMF ¶ 16; DRPSAMF ¶ 16. Mr. Long attended the Maine Criminal Justice Academy and graduated in 1978. PSAMF ¶ 15; DRPSAMF ¶ 15. From 1977 to 1992, Mr. Long worked as a full-time law enforcement officer at the following departments: Thomaston Police, York County Sheriff's Office, Old Orchard Beach Police, and Kittery Police. PSAMF ¶ 16; DRPSAMF ¶ 16. Mr. Long is currently self-employed as a contractor. PSAMF ¶ 17; DRPSAMF ¶ 17.

### B.   Events Leading to the Arrest

On August 9, 2014, Arthur J. Long drove to Portland for a visit and arrived at approximately 6:00 PM.[2] PSAMF ¶ 2; DRPSAMF ¶ 2. Mr. Long has a sister who

---

[2]    In their responses to the Plaintiff's statement of additional material facts, the Defendants repeatedly object on the ground that the Plaintiff's paragraphs contain multiple factual assertions and therefore violate District of Maine Local Rule 56(c). *See* DRPSAMF ¶ 2. They demand that the Court strike the allegedly offending paragraphs. *Id.*
    Local Rule 56(c) provides, as the Defendants point out, that "[t]he opposing statement may contain in a separately titled section additional facts, each set forth in a separately numbered paragraph and supported by a record citation as required by subsection (f) of this rule." D. ME. LOC.

lives on Munjoy Hill in Portland, and he visited her on August 9, 2014.  PSAMF ¶ 14; DRPSAMF ¶ 14.  He spent the evening walking throughout the Old Port and peninsula.  PSAMF ¶ 2; DRPSAMF ¶ 2.  People of all ages were out walking and enjoying the evening.[3]  *Id.*  Others were taking advantage of the warm night temperature by eating outside in front of their respective eateries.  *Id.*

At around 10:00 PM, Mr. Long entered an establishment called "Asylum." PSAMF ¶ 3; DRPSAMF ¶ 3.  There, he ordered food and consumed less than two glasses of beer before leaving at around 11:00 PM.  *Id.*  Mr. Long started to walk toward his vehicle, which was parked on Park Avenue in Portland near the Post Office.  PSAMF ¶ 4; DRPSAMF ¶ 4.

On his walk, he encountered an individual—identified in the record as Peter Bowers—sitting on the stairs in front of a building at 24 Preble Street.  *Id.*  As Mr. Long approached, Mr. Bowers, whom Mr. Long did not know, said "great night, huh?" *Id.*  The two men struck up a conversation.  *Id.*  As the conversation continued, Mr. Long sat down on the stairs with Mr. Bowers.  *Id.*  Mr. Bowers started talking about his girlfriend, and how they had had a falling out and she had left.  *Id.*  Mr. Bowers

---

R. 56(c).  The Court interprets this subsection as incorporating a modicum of common sense.  The subsection does not mean that each statement of material fact must be limited to one sentence only.  Its purpose is to require the proposing party to clearly provide record support for his proposed facts and to allow the responding party to isolate specific facts and object to them.  Although Mr. Long has occasionally stretched the spirit of the local rule, the Defendants have been able to interpose objections and the Court has been able to rule on them.  The Court overrules each of the Defendants' Local Rule 56(c) objections.

[3]      Mr. Long's paragraph 2 contains four sentences.  The Defendants did not object to the first two, but objected to the last two on foundational grounds.  The Court overrules these objections.  Mr. Long is relating what he personally observed while walking the streets of Portland during the evening of August 9, 2014.  The Court has some concerns about the relevance of these facts, which seems marginal, but the Defendants did not object on that ground.

was drinking from a beer can, and Mr. Long noticed another open beer can to the left of where Mr. Long was seated. *Id.* Mr. Long did not sip from any of the several cans of beer on or near the stairway at 24 Preble Street. PSAMF ¶ 27; DRPSAMF ¶ 27.

### C.   Mr. Long's Refusal to Provide Identification

Officer Brent Abbott, who began serving as a patrol officer for the PPD in 2011, was on duty on the evening of August 9, 2014. DSMF ¶¶ 1–2; PRDSMF ¶¶ 1–2. Shortly before midnight, Officer Abbott and another Portland police officer, Michael Bennis, received a call from dispatch to respond to a complaint of four to five males drinking in public and loitering at 24 Preble Street. DSMF ¶ 3; PRDSMF ¶ 3; PSAMF ¶¶ 18, 53–54; DRPSAMF ¶¶ 18, 53–54. When Officers Abbott and Bennis arrived at 24 Preble Street, they found two white males—a younger man and an older man— seated on the steps in front of the building. DSMF ¶ 4; PRDSMF ¶ 4.  Mr. Long was one of the two men. DSMF ¶ 7; PRDSMF ¶ 7. At no time did Mr. Long see a group of 4–5 males drinking on the stoop. PSAMF ¶ 19; DRPSAMF ¶ 19.

Mr. Long observed the two Portland police cruisers arrive. PSAMF ¶ 5; DRPSAMF ¶ 5. Officer Abbott exited the first cruiser and donned a pair of leather gloves. *Id.* There were several cans of beer near the stairway, including an open can approximately seven feet from Mr. Long.[4] DSMF ¶¶ 5, 8; PRDSMF ¶¶ 5, 8; PSAMF

---

[4]     The Defendants propose this statement: "Both males had an open 12 ounce can of beer next to them on the steps." DSMF ¶5 (citing DSMF, Attach. 3, *Aff. of Brent Abbott* ¶ 5 (ECF No. 31) (*Abbott Aff.*)).  Mr. Long seeks to qualify the statement to clarify that although there was a can of beer next to him, it was seven feet away. PRDSMF ¶ 5 (citing *Pl.'s Resp.*, Attach. 2, *Aff. of Pl. Arthur J. Long* ¶ 26 (ECF No. 35) (*Long Aff.*) ("[T]here were several cans of beer on or near the stairway at 24 Preble Street on August 9, 2014, the closest of which was about 7 feet from me")).

        The Defendants point out that "Mr. Long has admitted in response to a request for admission that when the Portland Police officers first spoke to him on August 9, 2014, he was seated next to an open can of beer." DSMF ¶ 8 (citing DSMF, Attach. 1, *Pl.'s Am. Resp. to Def. City of Portland's Request*

6

¶ 26; DRPSAMF ¶ 26.  The lighting where the incident occurred was adequate but not very bright. PSAMF ¶ 24; DRPSAMF ¶ 24.  There was no overhead lighting at 24 Preble Street, and the closest overhead light was approximately 200 feet away.  *Id.* According to Officer Abbott, the beer cans had a "sweat line" on them, indicating that they contained beer.[5]   DSMF ¶ 6; PRDSMF ¶ 6; PSAMF ¶ 25; DRPSAMF ¶ 25.

---

*for Admissions* ¶ 18 (ECF No. 31)).  Mr. Long's admission that "he was seated next to an open can of beer" and his statement that he was "about 7 feet" from the nearest can are not inconsistent.  Viewing the facts in the light most favorable to Mr. Long, the Court amends the Defendants' proposed statement to reflect that the nearest can of beer was seven feet away from Mr. Long.  *See Gillen v. Fallon Ambulance Service, Inc.*, 283 F.3d 11, 17 (1st Cir. 2002) (citing *C.K. Smith & Co. v. Motiva Enters.*, 269 F.3d 70, 72 (1st Cir. 2001)) ("Consistent with the conventional summary judgment praxis, we recount the facts in the light most hospitable to the appellant's theory of the case, consistent with record support").

[5]      The Defendants propose this statement: "Officer Abbott observed that the cans had a 'sweat line' on them, indicating to him that they contained beer."  DSMF ¶ 6 (citing *Tr. of Dep. of Brent D. Abbott* 38:8–14 (ECF No. 32) (*Abbott Dep.*); *Abbott Aff.* ¶ 6).  Mr. Long denies the statement, explaining that "it would not have been possible" for Officer Abbott to notice any "sweat line" because he never scrutinized or approached within seven feet of the beer can.  PRDSMF ¶ 6 (citing *Long Aff.* ¶ 25).

Mr. Long also proposes a statement that reasserts the language contained in his denial:

> Defendant Abbott testifies near the end of his deposition and in his affidavit that at nearly midnight in a badly lit location in Portland, he could make out "sweat lines" in cans of beer sitting on a public sidewalk, and thus could deduce that the cans contained beer.  This is simply not possible.  The lighting was not adequate for that, and at no point prior to arresting Mr. Long did Defendant Abbott touch or otherwise scrutinize the beer cans or even get any closer than 7 feet to any of them.

PSAMF ¶ 25 (citing *Long Aff.* ¶ 25); *see also* PSAMF ¶¶ 60–62.  The Defendants seek to qualify the statement.  DRPSAMF ¶ 25.  They admit that Officer Abbott observed a "sweat line" but argue that the remaining statements in the paragraph are legal arguments and not factual assertions.  *Id.*

Parties may not introduce legal arguments as if they constitute statements of fact, as the Court can "afford no evidentiary weight to 'conclusory allegations, empty rhetoric, unsupported speculation, or evidence which, in the aggregate, is less than significantly probative.'"  *Tropigas de P.R., Inc. v. Certain Underwriters at Lloyd's of London*, 637 F.3d 53, 56 (1st Cir. 2011) (quoting *Rogan v. City of Boston*, 267 F.3d 24, 27 (1st Cir. 2001)).

There is a genuine dispute regarding whether Officer Abbott observed a "sweat line" on the beer cans.  Mr. Long's claim that it was "simply not possible" for Officer Abbott to have observed a "sweat line" is speculative because Mr. Long cannot know what Officer Abbott observed.  At the same time, Mr. Long's assertions that Officer Abbott did not touch or draw within seven feet of the beer can are facts with record support.  The Court must view these facts in the light most favorable to Mr. Long.  Accordingly, the Court will maintain the facts alleged in the statement and remove only the conclusory language.  Additionally, the Court amends Officer Abbott's statement to clarify that it represents Officer Abbott's belief.

However, at no point prior to arresting Mr. Long did Officer Abbott touch or approach within seven feet of any beer can.  PSAMF ¶ 25; DRPSAMF ¶ 25.

Officer Abbott regularly patrolled the area around 24 Preble Street.[6]  DSMF ¶ 11.  According to the Defendants, at the time Officer Abbott encountered the two men on August 9, 2014, he believed that the city of Portland had posted signs prohibiting drinking at intervals of approximately 200 feet in the area encompassing 24 Preble Street and that there was such a sign within 200 feet of the address.[7]  DSMF ¶¶ 9–11.  By contrast, Mr. Long states that he returned to the area shortly after August 9, 2014, and there were no signs prohibiting drinking within 200 feet of 24 Preble Street.[8]  PSAMF ¶ 28; DRPSAMF ¶ 28.  Despite Mr. Long's long association with the

---

[6]     In his response, Mr. Long writes: "*See* Response to DSMF ¶ 9, and *see* Long Aff., ¶¶ 29-33." PRDSMF ¶ 11.  Neither his response to Defendants' statement nine nor his affidavit controvert the Defendants' assertion that Officer Abbott had regularly patrolled the area around 24 Preble Street. Mr. Long does not admit, deny, or qualify this statement and therefore failed to properly controvert it. It is deemed admitted pursuant to Local Rule 56(e).  D. ME. LOC. R. 56(e).

[7]     Mr. Long denies this statement.  PRDSMF ¶ 9.  He argues that there are no signs prohibiting drinking within 200 feet of 24 Preble Street and thus "[i]t would have been impossible for Defendant Abbott to have arrived at the belief that such signs were posted by the City of Portland in the area of 24 Preble Street approximately every 200 feet if he had in fact patrolled that area."  *Id.*  For support, Mr. Long cites his affidavit, in which he testifies that shortly after the incident, he returned to the area but could not locate any sign prohibiting drinking.  *Id.* (citing *Long Aff.* ¶ 28).  Additionally, Mr. Long highlights that Officer Abbott testified in his deposition that he believed that Officer Bennis went in search of a sign prohibiting drinking while Officer Abbott questioned Mr. Long.  *Id.* (citing *Abbott Dep.* 21:13–19).  Mr. Long points out there is no evidence in the record that Officer Bennis located any sign.  *Id.*

        There is a genuine dispute as to whether Officer Abbott truly believed there was a sign prohibiting drinking within 200 feet of 24 Preble Street.  Although the Court is charged with viewing the facts in the light most favorable to the nonmovant, the Court retains the Defendants' statement for purposes of later discussion; however, the Court amends the statement to make it clear that the statement only reflects Officer Abbott's belief that there was such a sign, not that there was in fact a sign.

        Mr. Long again raises this issue in his proposed statement thirty-six, which reads: "Defendant Abbott's claims about the prevalence of these signs in the area of Preble Street—on August 9, 2014 or ever—[are] demonstrably false." PSAMF ¶ 33.  The Defendants object.  DRPSAMF ¶ 33.  The Court agrees that this paragraph is argument, not evidence, and the Court has not included it.

[8]     The Defendants seek to qualify this statement.  DRPSAMF ¶ 28.  They admit that "at some indeterminate time after the incident in this case the Plaintiff was unable to locate any signs within 200 feet of 'the site' prohibiting drinking."  *Id.*  However, the Defendants assert that Mr. Long "has not

city of Portland,  PSAMF ¶ 29; DRPSAMF ¶ 29, he asserts that over a span of forty-five years, he has never observed a location in the city of Portland, with the exception of Wharf Street, where there are signs prohibiting drinking posted at intervals of 200 feet.[9,10] PSAMF ¶¶ 29; 31–32; DRPSAMF ¶¶ 29, 31–32.   The only places in the city of Portland where Mr. Long has observed posted signs prohibiting drinking and referencing the drinking in public ordinance are in the parts of the city with the densest concentrations of drinking establishments, including the Old Port on Wharf

established that he has personal knowledge of whether such signage existed on August 9, 2014 or a basis for any such personal knowledge." *Id.*  Additionally, the Defendants explain that Mr. Long's statement does not call into question Officer Abbott's belief that there was a sign prohibiting drinking within 200 feet of 24 Preble Street.  *Id.*

Mr. Long's affidavit states that he returned to "the site"—presumably 24 Preble Street—shortly after the arrest and that he did not observe any signs prohibiting drinking within 200 feet. *Long Aff.* ¶ 28.  Contrary to the Defendants' assertion, this fact does call into question the validity of Officer Abbott's belief.  Viewed in the light most favorable to Mr. Long, the fact that Mr. Long was unable to find a sign shortly after the arrest tends to show that there actually was no sign during the arrest, and based on this fact, a finder of fact may be more likely to conclude that Officer Abbott did not truly believe that there was a sign within 200 feet at the time of the arrest.  The Court retains the proposed statement.

[9]     Mr. Long proposes this statement: "There is no location in the City of Portland—aside from possibly Wharf Street—where at intervals of approximately 200 feet there are signs that prohibited drinking in public and that referenced state law, despite what Defendant Abbott testified to in his deposition."  PSAMF ¶ 31 (internal quotation marks omitted) (citing *Long Aff.* ¶ 2).  The Defendants interpose a denial, pointing out that the cited portion of Mr. Long's affidavit does not support this assertion.  DRPSAMF ¶ 31.  Moreover, they assert that Mr. Long has not established personal knowledge that would allow him to make such a categorical statement.

The Defendants are correct that the cited portion of Mr. Long's affidavit does not relate to this assertion.  Given that Mr. Long's statement of additional material facts is a near replica of his affidavit, the Court surmises that Mr. Long intended to cite to paragraph thirty-one of his affidavit, rather than paragraph two. *Long Aff.* ¶ 31.

The Court also agrees that Mr. Long has not demonstrated sufficient personal knowledge to support his broad claim regarding signage in the entire city of Portland.  However, Mr. Long was previously a police officer in Portland and has become familiar with the city over the past forty-five years.  *See* PSAMF ¶ 29; DRPSAMF ¶ 29.  Accordingly, the Court qualifies the statement to reflect that Mr. Long has not personally observed such signage in the city of Portland.

[10]    In PSAMF ¶ 32, Mr. Long expands on his statement in PSAMF ¶ 31.  He states, "*As far as Mr. Long is aware, there never has been* any location in the City of Portland" where there were signs prohibiting drinking at intervals of 200 feet.  PSAMF ¶ 32 (emphasis added).  The Defendants seek to qualify the statement, raising the same objections indicated in footnote 9.  DRPSAMF ¶ 32.  For the reasons set forth in footnote 9, the Court amends the statement and combines it with the amended PSAMF ¶ 31 to clarify that Mr. Long has never personally observed signage prohibiting drinking at intervals of 200 feet in the city of Portland.

9

Street, Fore Street, and Commercial Street, the bottom of Exchange and Market Streets, Congress Street near High Street and near the intersection of Washington Avenue, next to the Snug Pub and Sulky Lounge.[11]  PSAMF ¶ 30; DRPSAMF ¶ 30.

Officer Abbott believed that it was PPD policy to issue a warning to a person suspected of drinking in public—unless that person had already received a warning earlier in the calendar year.[12]  DSMF ¶ 13; PRDSMF ¶ 13.  As Officer Abbott understood it, the officers ask for a suspect's identification to determine if a suspect previously received a warning and to generate a report if a warning is necessary. DSMF ¶ 14; PRDSMF ¶ 14.  Officer Abbott asked both Mr. Long and Mr. Bowers for identification.[13]  PSAMF ¶ 5; DRPSAMF ¶ 5. Officer Abbott did not inform Mr. Long of the PPD's warning policy.  PSAMF ¶¶ 37–38; DRPSAMF ¶¶ 37–38.  Mr. Bowers

---

[11]    The Defendants interpose a qualified response to this statement.  DRPSAMF ¶ 30.  They contend that Mr. Long does not have sufficient personal knowledge of the city of Portland to make this statement.  *Id.*  The Court disagrees.  For the reasons previously noted, Mr. Long's combined experience would be sufficient to allow a factfinder to determine that his observations of the no-drinking signage in Portland were accurate.  The Court deems Plaintiff's paragraph thirty admitted.

[12]    Mr. Long denied this statement and paragraph 14.  PRDSMF ¶¶ 13–14.  He notes that Chief Sauschuck did not testify to this policy nor did Assistant Chief Malloch.  *Id.*  He also observes that the Defendants did not cite any standard operating procedure or other procedural rule or policy to support this statement.  *Id.*  Finally, he argues that a factfinder "could easily conclude that this is a false, self-serving statement."  *Id.*  Even so, Mr. Long's concerns do not render Officer Abbott's statement inadmissible.  The Defendants supported the statement with a record reference to Officer Abbott's deposition transcript and affidavit.  This is sufficient to allow the statements and it is not permissible to reject the statements based on the argument that a factfinder might not believe them.  However, as the statement is based solely on Officer Abbott's sworn statements and is not corroborated by any objective support, the Court qualifies these paragraphs to reflect that they are Officer Abbott's understanding of the police policy.

[13]    The Defendants propose this statement: "The officers advised the two men that they were prohibited from drinking in public and the officers asked for their identification."  DSMF ¶ 12 (citing *Abbott Dep.* 39:4–12; *Abbott Aff.* ¶ 10).  Mr. Long denies the statement.  PRDSMF ¶ 12.  According to Mr. Long's version, Officer Abbott exited his cruiser and first asked for identification.  PSAMF ¶ 5 (citing *Long Aff.* ¶ 5).  The record supports Mr. Long's version.  *See Long Aff.* ¶ 5 ("[Officer Abbott] exited the car while putting on some leather gloves.  [Officer Abbott] asked [Mr. Long and Mr. Bowers] for some identification."  *Long Aff.* ¶ 5.  Viewing the record in the light most favorable to Mr. Long, the Court omits the Defendants' statement.

provided Officer Abbott with identification.  DSMF ¶ 15; PRDSMF ¶ 15; PSAMF ¶ 5;
DRPSAMF ¶ 5.  The officers gave Mr. Bowers a warning not to drink in public and
advised him to move along.  DSMF ¶ 16; PRDSMF ¶ 16.

Mr. Long asked Officer Abbott why he wanted him to produce identification.
PSAMF ¶ 5; DRPSAMF ¶ 5.  Officer Abbott said to Officer Bennis, "Oh, we got a wise
guy here."  *Id.*  Officer Abbott stated to Mr. Long, "Didn't you know that it's against
the law to drink in public?"[14]   *Id.*; PSAMF ¶ 34; DRPSAMF ¶ 34.   Mr. Long
immediately told Officer Abbott that he was not drinking in public.  PSAMF ¶¶ 5, 27;
DRPSAMF ¶ 5, 27.  Officer Abbott referred to the open beer can to Mr. Long's left,
and Mr. Long explained that the beer can was there before he arrived.  PSAMF ¶ 5;
DRPSAMF ¶ 5.  Officer Abbott never observed Mr. Long take a drink from the nearby
beer cans, PSAMF ¶ 57, DRPSAMF ¶ 57, and Mr. Long repeatedly denied that he
had been drinking in public.  PSAMF ¶¶ 34–35, 58; DRPSAMF ¶¶ 34–35, 58.  While
Officer Abbott confronted Mr. Long, Officer Bennis went looking without success for
a sign posted within 200 feet prohibiting drinking.[15]  PSAMF ¶ 70; DRPSAMF ¶ 70.

---

[14]     The Defendants admit this statement but propose the following: "Officer Abbott explained to
Mr. Long that he was suspected of drinking in public and that the officers needed his identification."
DSMF ¶ 18 (citing *Abbott Dep.* 25:15–20, 39:4–12; *Abbott Aff.* ¶ 16).  Mr. Long denies this statement,
asserting that Officer Abbott never accused him of drinking in public.  PRDSMF ¶ 18 (citing *Long Aff.*
¶¶ 5, 35).  Rather, Mr. Long asserts that Officer Abbott asked him if he knew that drinking in public
was a crime.  *Id.*  Mr. Long may be splitting hairs, but the record supports the denial.  *See Long Aff.*
¶¶ 5, 35.  Viewing the facts in the light most favorable to Mr. Long, the Court omits the Defendants'
proposed statement.

[15]     Mr. Long proposes this statement: "While Defendant Abbott confronted Mr. Long, Officer
Bennis went looking, without success, for a sign posted within 200 feet prohibiting drinking."  PSAMF
¶ 70.  The Defendants qualify the statement to assert that the record does not suggest that Officer
Bennis looked "without success."  DRPSAMF ¶ 70.
        The record reveals that during the incident, Officer Bennis "went and looked for a 'drinking in
public' sign"; however, Officer Bennis' statement does not indicate whether he ever found one.  *Tr. of
Dep. of Michael J. Sauschuck* 21:11–25 (ECF No. 33) (*Sauschuck Dep.*).

Officer Abbott again requested Mr. Long's identification, and Mr. Long again asked why. PSAMF ¶ 6, 36; DRPSAMF ¶ 6, 36. Officer Abbott asked Mr. Long, "Do you live here?" PSAMF ¶ 6; DRPSAMF ¶ 6. Mr. Long replied that he did not. *Id.* Officer Abbott stated, "You're trespassing."[16] *Id.* Mr. Long formerly served as a police officer in Maine and did not believe that he was trespassing.[17] *Id.*; PSAMF ¶¶ 15–16; DRPSAMF ¶¶ 15–16. The stoop was approximately ten feet across and Mr. Long and Mr. Bowers were not blocking entry or exit from the building.[18] PSAMF ¶¶ 21, 23. To Mr. Long's knowledge, no one complained to them or about them regarding their blocking public access to the building or committing any other act.[19] PSAMF ¶ 22; DRPSAMF ¶ 22.

---

Mr. Long is in the difficult position of proving a negative: that a sign did not exist. As Officer Bennis searched for a sign during the incident, the Court infers that if he had found one within two hundred feet of 24 Preble Street, he would have said so. The Court deems paragraph seventy admitted without qualification.

[16] The Defendants propose: "Officer Abbott also explained to Mr. Long that he was loitering." DSMF ¶ 19 (citing *Abbott Dep.* 39:4–12). Mr. Long denies the statement, explaining that Officer Abbott accused him of trespassing, not loitering. PRDSMF ¶ 19. The record supports the denial. In Officer Abbott's deposition, he admits, "I believe I may have used the word 'trespass'[.]" *Abbott Dep.* 39:21. The Court omits the Defendants' proposed statement.

[17] Mr. Long proposes this statement: "As a graduate of the Maine Criminal Justice Academy municipal police school and having been employed as a full-time Maine police officer, Mr. Long knew that he was not trespassing within the definition of 17A." PSAMF ¶ 6. The Defendants contend that this is a legal argument and does not constitute a fact that requires a response. DRPSAMF ¶ 6. The Court agrees that Mr. Long's statement that he "knew that he was not trespassing" is a legal conclusion. *See Tropigas*, 637 F.3d at 56. The Court amends the language to clarify that Mr. Long believed that he was not trespassing.

[18] The Defendants qualify this statement as a conclusory assertion that does not require a response. DRPSAMF ¶ 21. The Court disagrees. In this statement, Mr. Long does not simply conclude that he was not trespassing. Rather, he offers the dimensions of the stoop and the positioning of his and Mr. Bowers' bodies relative to the entrance of the building as facts to support his claim that he was not trespassing. Viewing the facts in the light most favorable to Mr. Long, the Court admits the statement.

[19] Mr. Long proposes this statement: "No one complained to them or about them regarding blocking public access [] at 24 Preble Street on August 9, 2014[.]" PSAMF ¶ 22 (citing *Long Aff.* ¶ 22; *Dep. of Arthur J. Long* 29:7–9 (ECF No. 34) (*Long Dep.*). The Defendants deny the statement, arguing that Mr. Long "has not demonstrated personal knowledge as to complaints made about them[.]" DRPSAMF ¶ 22. Mr. Long's statement largely parrots the cited record evidence: "No one complained to us or about us, as far as I know, about blocking public access…" *Long Aff.* ¶ 22. The Court disagrees

Officer Abbott said, "Let's see some ID or you're going to fucking jail."  PSAMF ¶ 7; DRPSAMF ¶ 7; DSMF ¶ 21; PRDSMF ¶ 21.  Mr. Long protested Officer Abbott's decorum and language and asked why he would be going to jail.  *Id.*  Officer Abbott responded, "For not providing ID."  PSAMF ¶ 7; DRPSAMF ¶ 7.  Mr. Long replied, "I'm not giving you my ID."  *Id.*; DSMF ¶¶ 17, 20, 22; PRDSMF ¶¶ 17, 20, 22.

### D.      The Arrest

At this point, Mr. Long told Officer Abbott that he was going to video tape the incident on a cell phone.  PSAMF ¶ 42; DRPSAMF ¶ 42.  Immediately thereafter, Officer Abbott ordered Mr. Long to stand up, turn around, and put his hands behind his back.[20]  PSAMF ¶¶ 8, 43; DRPSAMF ¶¶ 8, 43.  According to the Defendants, both when Officer Abbott requested Mr. Long's identification and when he made the arrest, Officer Abbott believed that he had probable cause that Mr. Long was drinking in public and loitering.[21]  DSMF ¶ 28; PRDSMF ¶ 28; PSAMF ¶ 56; DRPSAMF ¶ 56.

---

that Mr. Long failed to demonstrate personal knowledge regarding complaints made about him.  Even if someone did not complain directly to Mr. Long, Mr. Long might have overheard others complaining about them.  Mr. Long's statement clarifies that he was unaware of people complaining about their presence, either directly or indirectly.  The Court includes the statement.

[20]      The Defendants propose this statement: "Before applying handcuffs to Mr. Long, Officer Abbott advised Mr. Long that he was placing him under arrest for refusing to provide identification."  DSMF ¶ 27 (citing *Abbott Aff.* ¶ 20).  Mr. Long denies this statement, arguing that Officer Abbott placed him under arrest immediately after Mr. Long said that he was going to film the incident.  PRDSMF ¶ 27 (citing *Long Aff.* ¶ 42).  The record supports Mr. Long's denial.  *See Long Aff.* ¶ 42 ("Immediately after I told Defendant Abbott that I was going to video tape the incident on my cell phone, he told me I was under arrest").  Viewing the record in the light most favorable to Mr. Long, the Court omits the Defendants' proposed statement.

[21]      Mr. Long denies this statement.  PRDSMF ¶ 28.  He states that "[n]o reasonably well-trained officer in Defendant Abbott's shoes could have believed that probable cause existed for either drinking in public or loitering."  PRDSMF ¶ 28.  Mr. Long's denial constitutes a legal conclusion, and Mr. Long violates Local Rule 56(c) by failing to cite any record evidence in support of his denial.

Nevertheless, the Court recognizes the difficulty in disproving an individual's belief, and based on the other facts in the record, there is a genuine dispute regarding whether Officer Abbott truly believed there was probable cause to arrest Mr. Long for drinking in public or loitering.  For purposes of later discussion, the Court retains the Defendants' statement but amends it to clarify that it reflects only the Defendants' position.

At no time during the encounter did Officer Abbott believe that he was in any kind of danger.[22]  PSAMF ¶ 85; DRPSAMF ¶ 85.

As Mr. Long was getting up and beginning to turn around and put his hands behind his back, Officer Abbott shoved Mr. Long from behind.  DSMF ¶ 30; PRDSMF ¶ 30; PSAMF ¶¶ 8, 44; DRPSAMF ¶¶ 8, 44.  Mr. Long could not tell whether he was shoved by one hand or two.  DSMF ¶ 32; PRDSMF ¶ 32.  Mr. Long was not punched or struck with any implement.  DSMF ¶ 31; PRDSMF ¶ 31.  Mr. Long fell face down onto the steps, hitting the second stair with his chest.  PSAMF ¶¶ 8, 77; DRPSAMF ¶¶ 8, 77; DSMF ¶ 33; PRDSMF ¶ 33.  Officer Abbott then placed handcuffs on Mr. Long.[23]  PSAMF ¶ 8; DRPSAMF ¶ 8; DSMF ¶ 34; PRDSMF ¶ 34.  Although Mr. Long never consented to Officer Abbott touching him in any manner, Mr. Long did not resist.  PSAMF ¶¶ 40–41, 84; DRPSAMF ¶¶ 40–41, 84.  As Officer Abbott helped Mr. Long to his feet, Mr. Long requested to see a supervisor.  PSAMF ¶ 8; DRPSAMF ¶ 8.  Mr. Long did not sustain a bruise, nor did he seek any medical treatment as a result of the incident.  DSMF ¶ 35; PRDSMF ¶ 35; PSAMF ¶ 46; DRPSAMF ¶ 46.

---

[22]     Mr. Long proposes this statement in relevant part: "Defendant Abbott never felt at any time in dealing with Mr. Long that Mr. Long was in possession of weapons or was otherwise any threat to officer or public safety."  PSAMF ¶ 85 (citing *Abbott Dep*. 22:2–5).  The Defendants qualify the statement, arguing the record material does not support the assertion.  The Court amends the statement to more closely align with the record evidence.

[23]     The Defendants attest that "Office Abbott stood Mr. Long up and prepared to place him in handcuffs."  DSMF ¶ 29 (citing *Abbott Dep*. 33:11–14).  Mr. Long denies the statement.  PRDSMF ¶ 29.  According to Mr. Long's version, Officer Abbott handcuffed him while he was on the ground.  PSAMF ¶ 8.  The record supports Mr. Long's version.  *See Long Aff*. ¶ 8 ("[Officer Abbott] shoved me from behind forcing me face down on the stairs whereupon he began placing handcuffs on me").  Viewing the facts in the light most favorable to Mr. Long, the Court omits the Defendants' proposed statement.

Before the supervisor arrived, Officer Abbott reached into Mr. Long's front left pocket and removed Mr. Long's wallet.[24]  PSAMF ¶ 9; DRPSAMF ¶ 9.  Sometime later, prior to being transported to the Sheriff's office and while still in handcuffs, Mr. Long asked Officer Abbott if he still had Mr. Long's wallet.  *Id.*  Officer Abbott looked around as if he had misplaced it.  *Id.*  Mr. Long scanned the area and located his wallet resting on the stairs.  *Id.*  Officer Abbott said, "There's no ID in it."  *Id.*; DSMF ¶ 25; PRDSMF ¶ 25.  Mr. Long did not keep his identification in his wallet; rather, he kept his identification and credit cards in a hard case that was located in his front right pocket.  PSAMF ¶ 9; DRPSAMF ¶ 9.  However, the wallet did contain over $700 in cash.  *Id.*  Officer Abbott asked for Mr. Long's identification one more time, and Mr. Long again refused.  DSMF ¶ 26; PRDSMF ¶ 26.

When the supervisor arrived, Mr. Long related his version of the events, including what he perceived to be Officer Abbott's unprofessional, profane language and conduct.[25]  PSAMF ¶ 10, DRPSAMF ¶ 10.  Subsequently, the officers transported

---

[24]    The Defendants assert that Officer Abbott "rolled Mr. Long…on his side and removed his wallet" before placing him in handcuffs.  DSMF ¶ 23 (citing *Abbott Dep.* 27:7–17).  First, Mr. Long denies the statement, arguing that Officer Abbott "did not conduct this search until after he was placed under arrest[.]"  PRDSMF ¶ 23 (citing *Long Aff.* ¶¶ 8–9).  The record supports the denial.  *See Long Aff.* ¶¶ 8–9 ("[T]he officer shoved me from behind forcing me face down on the stairs whereupon he began placing handcuffs on me…[T]he arresting officer [then] reached into my front left pocket where he removed my wallet").  Later, Mr. Long asserts that "[i]n fact, Defendant Abbott searched Mr. Long *before* he was under arrest."  PSAMF ¶ 100 (emphasis added).  The record supports this assertion as well.  *See Abbott Dep.* 27:10–22.  The Court is unsure what position Mr. Long wants to take.  For purposes of the Court's Fourth Amendment analysis, however, the distinction is not material.  In either case, viewing the facts in the light most favorable to Mr. Long, it appears that Mr. Long was detained when Officer Abbott reached into his pocket.  *See Abbott Dep.* 27:18–28:4.  Given the flow of the events, the Court assumes that Mr. Long was in handcuffs at the time Officer Abbott performed the search.

[25]    Mr. Long proposes this statement: "When the supervisor arrived, Mr. Long relayed his version of the events that took place including Officer Abbott's unprofessional, profane language and conduct."  PSAMF ¶ 10.  The Defendants seek to qualify the statement.  They admit that Mr. Long spoke with a supervisor but argue that the remainder of the statement is legally conclusory.  DRPSAMF ¶ 10.  The Court disagrees.  The statement clarifies that it was Mr. Long's view of Officer Abbott's conduct and it was also what Mr. Long says he told the supervisor.

Mr. Long to the Cumberland County Jail where he went through a booking process. PSAMF ¶ 11, DRPSAMF ¶ 11.  Mr. Long was charged with failure to give a correct name and date of birth, in violation of 17-A M.R.S. § 15-A(2).  DSMF ¶ 36; PRDSMF ¶ 36.  Officer Abbott did not arrest or cite Mr. Long for the offenses of drinking in public or loitering.  PSAMF ¶¶ 72, 76, DRPSAMF ¶¶ 72, 76.  Mr. Long engaged a criminal defense attorney to defend him against the charges, and despite the fact that the case was dismissed early on, he paid a flat fee of $1,500.  PSAMF ¶ 52; DRPSAMF ¶ 52.

## E.   The Internal Investigation

On August 10, 2014—one day after the arrest—Mr. Long typed a statement of facts that described his version of the events the night before.[26]  PSAMF ¶ 50; DRPSAMF ¶ 50.  *Dep. of Arthur Long*, Ex. 3, *Statement of Arthur J. Long* at 32–33 (ECF No. 34) (*Long Statement*).  Almost four months later, on December 4, 2014, Mr. Long sent his statement of facts along with a letter entitled "Complaint of Officer and Department Conduct" to Lieutenant Robert Martin of the Internal Affairs Division of the PPD.  *Dep. of Arthur Long*, Ex. 3, *Compl. of Officer and Dep't Conduct* at 31 (ECF No. 34) (*Long Letter*); DSMF ¶ 42; PRDSMF ¶ 42; PSAMF ¶ 50; DRPSAMF ¶ 50.  The letter notified Lieutenant Martin that Mr. Long was submitting the statement of facts

---

[26]     Mr. Long originally proposed this statement in relevant part: "Mr. Long wrote/typed his Statement of Claim…and sent it out with a transmittal letter describing his 'formal complaint' regarding the events of August 9, 2014 to Lieutenant Robert Martin…" PSAMF ¶ 50.  The Defendants seek to qualify the statement, pointing out that the document Mr. Long references was not a "Statement of Claim"; rather, it was entitled "Statement of Arthur J. Long."  The record supports the Defendant's qualification.  *See Dep. of Arthur Long*, Ex. 3, *Statement of Arthur J. Long* at 32–33 (ECF No. 34) (*Long Statement*).  The Court amends the statement to reflect that Mr. Long typed "a statement of facts"—the term Mr. Long used in his transmittal letter to Lieutenant Martin.  *See Dep. of Arthur Long*, Ex. 3, *Compl. of Officer and Dep't Conduct* at 31 (ECF No. 34) (*Long Letter*).

"as a formal complaint against the arresting officer and against those individuals who may be either directly or indirectly involved in this matter." *Long Letter* at 31. In his complaint, Mr. Long did not specifically state that the officers lacked probable cause for the arrest or that the officers conducted an unlawful search; nevertheless, the context of the letter suggested that Mr. Long was complaining that he had been arrested without probable cause.[27]  DSMF ¶ 43; PRDSMF ¶ 43.

Sergeant Julie Cannafarina investigated Mr. Long's complaint. *Dep. of Arthur J. Long* at 26 (ECF No. 34) (*Long Dep.*). She determined that Mr. Long's letter contained two allegations: (1) that Officer Abbott used excessive force, and (2) that Officer Abbott used profane and unprofessional language. *Id.* at 26; DSMF ¶ 45; PRDSMF ¶ 45. On July 23, 2015, Assistant Chief Vernon Malloch reviewed Sergeant Cannafarina's investigation and recommended "a finding of not sustained for both allegations against Officer Abbott." *Long Dep.* at 27. On July 28, 2015, Chief Sauschuck concurred with Assistant Chief Malloch and concluded that Mr. Long's allegations were not sustained. *Id.* at 28–29; DSMF ¶ 46; PRDSMF ¶ 46; PSAMF ¶ 93; DRPSAMF ¶ 93. Because the investigation did not address the issue of probable cause, Chief Sauschuck did not evaluate that issue.[28]  DSMF ¶ 37.

---

[27]   The Defendants propose the following: "Mr. Long did not state in his complaint that the officers lacked probable cause for his arrest." DSMF ¶ 43. Mr. Long denies the statement, pointing out that "Mr. Long clearly implied in his complaint that no such probable cause existed." PRDSMF ¶ 43. A review of the December 4, 2014 letter reveals that Mr. Long never mentioned the absence of probable cause; nevertheless, the context of the letter indicates that he was complaining to the PPD that he had been arrested without probable cause. Viewing the facts in the light most favorable to Mr. Long, the Court includes the Defendants' statement that the complaint did not mention the words, "probable cause," and adds that it is a logical inference from the contents of the letter that Mr. Long was complaining about being arrested without probable cause.

[28]   Mr. Long denies this statement, claiming that "Chief Sauschuck refused under any circumstances to consider or evaluate whether probable cause existed, despite repeated invitations to

On February 18, 2015, while the PPD investigated Mr. Long's December 4, 2014 letter, Mr. Long visited Attorney Michael Waxman. PSAMF ¶ 47; DRPSAMF ¶ 47. Attorney Waxman drafted a "Notice of Claim" and sent it to the PPD by certified mail on February 20, 2015.[29] PSAMF ¶ 49; DRPSAMF ¶ 49; DSMF, Attach. 2, *Pl.'s Resp. to Req. for Production* at 8–9 (ECF No. 31).

### F.   Chief Michael Sauschuck

Michael Sauschuck has been the Chief of Police in Portland since 2012. DSMF ¶ 37; PRDSMF ¶ 37. Chief Sauschuck was not present for the incident involving Mr. Long and had no physical contact with Mr. Long on August 9, 2014. DSMF ¶¶ 38, 40; PRDSMF ¶¶ 38, 40. Chief Sauschuck was not involved in the decision to arrest Mr. Long, nor was he involved in any searches of Mr. Long. DSMF ¶¶ 39, 41; PRDSMF ¶¶ 39, 41.

The PPD maintains policies with regard to arrests, searches, and the use of force. DSMF ¶ 56; PRDSMF ¶ 56. The PPD requires that officers receive regular

---

do so at his deposition." PRDSMF ¶ 47. Mr. Long also points out that Chief Sauschuck testified that "if an open container is 7 feet away from an individual I would say that there's not reason to believe that it's constructive possession." *Id.* (citing *Sauschuck Dep.* 41:16–19. From this, Mr. Long states that the "only logical conclusion to draw about why Chief Sauschuck 'did not conduct any evaluation of probable cause' is that he is aware it did not exist on August 9, 2014…[w]hy else would the CEO and head of a paramilitary structure be so remarkably evasive about this central issue?" *Id.*

The record does not support Mr. Long's argument that Chief Sauschuck was "remarkably evasive" in responding to why he did not address the issue of probable cause in his review of the internal investigation. Chief Sauschuck repeatedly and consistently explains that he did not explore probable cause because the investigation was based only on Officer Abbott's alleged use of force and improper language and because the District Attorney's office previously determined that Officer Abbott had probable cause for an arrest. *See Sauschuck Dep.* 13:12–14:17; 16:16–18; 17:7–10; 17:23–18:3; 18:15–20; 19:3–7.

[29]    Mr. Long's proposed statement indicates that Attorney Waxman sent the Notice of Claim to "the Defendants." PSAMF ¶ 49. The Defendants seek to qualify the statement, explaining that Attorney Waxman sent the notice to the PPD. DRPSAMF ¶ 49. The record supports the Defendants' qualification. *See* DSMF, Attach. 2, *Pl.'s Resp. to Req. for Production* at 8–9 (ECF No. 31).

training on these policies.[30]   DSMF ¶ 57.   According to the Defendants, Officer Abbott

is familiar with the PPD policies regarding arrests, searches, and the use of force.[31]

DSMF ¶ 59.   Since Officer Abbott started with the PPD, he has received training in

warrantless arrests, lawful searches, the use of force, and requests for

identification.[32]   DSMF ¶¶ 60–63; PRDSMF ¶¶ 60, 62–63.   The Defendants allege

---

[30]     Mr. Long denies this statement, pointing out that the statement is "too broad or vague" and that "[t]here is no record citation to any particular policy which requires officers to receive regular training[.]" PRDSMF ¶ 57.  The Court disagrees that the statement is broad or vague.  Moreover, the Defendants do not need to cite a particular policy provision; the sworn affidavit of Portland's police chief is sufficient to include the asserted fact.   Here, Chief Sauschuck's affidavit supports the Defendants' assertion that officers in Portland receive regular training. *See Sauschuck Aff.* ¶ 15; *see also Abbott Dep.* 57:10–22.  Because the Defendants provide a proper foundation for the statement and because Mr. Long offers no relevant facts to the contrary, the Court admits the Defendants' statement.
[31]     Mr. Long denies this statement, arguing that "[t]his statement is simply not one we can conjure any record citation to disagree with, for it would involve getting inside Defendant Abbott's head." PRDSMF ¶ 59.  Although the Court recognizes that it is difficult to disprove an individual's thoughts or beliefs, Mr. Long had the ability during discovery to make inquiries of Officer Abbott designed to elicit whether he was actually familiar with the PPD policies.  Mr. Long could then cite Officer Abbott's responses as evidence that Officer Abbott was not familiar with the policies.  As it stands, Mr. Long offers no evidence to rebut the Defendants' assertion.   Consequently, the Court includes the Defendants' statement but amends the language to clarify that the statement reflects the Defendants' position.
[32]     Mr. Long denies that Officer Abbott received training as to when it is permissible to request identification from an individual.  PRDSMF ¶ 61 (citing *Abbott Dep.* 58:19–59:15).  The Court rejects Mr. Long's denial.  During Officer Abbott's deposition, Attorney Waxman questioned him about the training he has received since joining the PPD.  *See Abbott Dep.* 57:2–60:1.  Officer Abbott explained that he receives quarterly on-line training regarding warrantless arrests, the use of force, and certain statutes.  *Id.* 57:2–16.  He further explained that if there are changes in the law that affect warrantless arrests, the use of force, or any other issues, he typically receives a group email followed by on-line or classroom training.  *Id.* 57:23–58:4.
   Mr. Waxman inquired:

   Q:     Has there been any specific training with regard to arresting those who have—
          are believed to have committed a Class D or E crime outside your presence?
   A:     It would have to be on-line trainings.
   Q:     But no specific seminar that you [can] think of or memo that you can think of
          that addressed that issue?
   A:     Not off the top of my head. I would have to look at the training records.

*Id.* 58:10–18.  Thus, Mr. Waxman's line of questioning appears to distinguish between on-line training on one hand and specific classroom seminars and departmental memoranda on the other.  Immediately thereafter, Mr. Waxman asked:

that from the time of Chief Sauschuck's employment in 2012 through the evening of August 9, 2014, Chief Sauschuck was not aware of any pattern or practice of Portland police officers—including Officer Abbott—making arrests without probable cause, using excessive force, requesting identification without a proper justification, or conducing unlawful searches.[33]  DSMF ¶¶ 48–55, 58.

---

| | |
|---|---|
| Q: | Can you recall there being any formal training by the Portland Police Department with regard to the appropriateness of demanding that citizens produce identification? |
| A: | Not off the top of my head, not a certain block of training. |
| Q: | Can you recall this ever being an issue that's been discussed or brought up by any kind of memoranda at the Portland Police Department? |
| A: | Not off the top of my head. |
| Q: | Has this ever, that you can recall, been a hot topic of discussion among officers informally? |
| A: | It's a hot topic throughout the land. |
| Q: | Okay.  And in your overhearing or participating in these discussions, has there been a consensus as to when it's appropriate to demand that citizens produce identification? |
| A: | With the training, yeah… |

*Id.* 59:6–23.  Mr. Long cites this passage to show that Officer Abbott did not receive any training with respect to requesting identification.  PRDSMF ¶¶ 57, 61.  However, given Mr. Waxman's earlier line of questioning, it appears that Mr. Waxman's questions and Officer Abbott's responses were geared toward whether Officer Abbott received training in the form of formal classroom seminars or departmental memoranda.  Mr. Waxman never specifically asked about other forms of training, including on-line training, even though Officer Abbott explained earlier that he received on-line training as an officer with the PPD.  *Id.* 57:10–16.

The record indicates that Officer Abbott received at least some training on the issue of requesting identification.  First, Officer Abbott's sworn affidavit asserts, "Since I started with the Portland Police Department, I have received training as to when it is permissible to request identification from people."  *Abbott Aff.* ¶ 24.  In addition, Officer Abbott specifically mentioned "training" in response to Mr. Waxman's question about whether there is "a consensus as to when it's appropriate to demand that citizens produce identification."  *Id.* 59:20–23.  The Court concludes that Officer Abbott received some training on requesting identification, but the training did not necessarily involve departmental memos or formal instruction at the PPD.

[33]   In response to DSMF ¶¶ 48–55, Mr. Long offers a boilerplate denial:

> Deny.  The only way for Chief Sauschuck to be and remain unaware of any pattern or practice…would be for him to turn a blind eye to it, as he has in this case.  "There's none so blind as those who will not see."  This is the very essence of deliberate indifference.  Refusing to even consider whether Defendant Abbott [established probable cause, was justified in demanding that Mr. Long produce identification, searched Mr. Long without a proper justification, or used excessive force] underscores a deliberately indifferent attitude toward the conduct of his officers and the rights of persons who come into contact with his officers.

## III.    PARTIES' POSITIONS

### A.    Mr. Long's Fourth Amended Complaint

Mr. Long asserts the following claims:

#### 1.    Counts I–III (Violations of 42 U.S.C. § 1983)

In Count I, Mr. Long alleges that Officer Abbott, under color of state law, subjected Mr. Long to a deprivation of his constitutional rights, specifically his rights to (1) bodily integrity, (2) freedom from the use of unreasonable force, (3) freedom from unreasonable warrantless searches, (4) freedom from arrest except upon a finding of probable cause, and (5) procedural and substantive due process. *Fourth Am. Compl.* ¶ 53.

In Count II, Mr. Long alleges that Chief Sauschuck's "failure to a) properly supervise and/or discipline Officer Abbott and/or b) promulgate appropriate policies regarding arrests upon probable cause, and the use of force and c) train his officers, including Officer Abbott, on arrest upon probable cause and the appropriate use of force" displayed a "reckless or callous disregard of, or indifference to, the rights of Mr. Long." *Id.* 67–68.

In Count III, Mr. Long alleges Chief Sauschuck, as a policymaker for the city of Portland, "adopted a custom or policy of abdicating any appropriate level of supervision and/or discipline" of Officer Abbott. *Id.* ¶ 73. Mr. Long also asserts that

---

PRDSMF ¶¶ 48–55; *see also* PRDSMF ¶ 58.

    Mr. Long fails to cite any record evidence to support his denials.  *See* D. ME. LOC. R. 56(c). Under Local Rule 56(f), the Court is authorized to "deem admitted" the Defendants factual assertions. *See* D. ME. LOC. R. 56(f).  However, out of an abundance of deference to Mr. Long as the nonmovant, and recognizing that it is difficult to disprove an individual's personally-held belief, the Court amends the statement of fact to make clear that the statement reflects the Defendants' position.

Chief Sauschuck "adopted a custom or policy of permitting his officers to make arrests without establishing probable cause and to use force under circumstances which do not in fact require such force, and to conduct unreasonable searches." *Id.* ¶ 74. Mr. Long contends such an approach to the use of arrests and force amounts to an unconstitutional custom or policy that represented a "reckless or callous disregard of, or indifference to, the rights of Mr. Long." *Id.* ¶¶ 75, 77.

### 2.   Counts IV (Assault) and V (Unlawful Arrest)

In Count IV, Mr. Long alleges that Officer Abbott's actions constituted an unjustified assault upon Mr. Long. *Id.* ¶ 79. Further, in Count V, Mr. Long asserts that Officer Abbott arrested him in bad faith and without probable cause. *Id.* ¶ 82–83.

### B.   The Defendants' Motion for Summary Judgment

The Defendants request summary judgment on all counts in Mr. Long's Fourth Amended Complaint. First, the Defendants argue that the record evidence does not indicate that any of the Defendants committed constitutional violations. Next, the Defendants contend that qualified immunity protects Officer Abbott and Chief Sauschuck from liability for alleged constitutional violations. Finally, the Defendants claim that Officer Abbott is entitled to summary judgment on Mr. Long's state law claims because Officer Abbott is entitled to discretionary function immunity and because Mr. Long failed to comply with the procedural requirements of the MTCA.

### 1.   Mr. Long's Constitutional Claims

### a.   Probable Cause to Arrest Mr. Long

22

The Defendants state that Officer Abbott arrested Mr. Long for failure to give a correct name or date of birth in violation of 17-A M.R.S. 15-A(2). *Defs.' Mot.* at 3. That statute provides in relevant part that "[a]ny person who a law enforcement officer has probable cause to believe has committed or is committing a crime...who intentionally fails or refuses to provide to that officer reasonably credible evidence of that person's correct name, address or date of birth commits a Class E crime[.]" 17-A M.R.S. § 15-A(2).

The Defendants claim that Officer Abbott had probable cause to believe that Mr. Long committed the crime of drinking in public in violation of 17 M.R.S. § 2003-A(2). According to the Defendants:

> "Mr. Long's presence where males were reported to have been drinking in public, and the fact that Mr. Long was next to an open and partially full can of beer in an area the City routinely posts with signs prohibiting public drinking, constitute sufficient information to establish the elements of the crime [of drinking in public.]"

*Defs.' Mot.* at 5.

Additionally, the Defendants assert that Officer Abbott had probable cause to believe that Mr. Long was loitering in violation of the city of Portland's Code of Ordinances. *Id.* at 6. The Defendants claim that Officer Abbott was aware of a report of males loitering at 24 Preble Street and found Mr. Long sitting on the stairs in front of that address. *Id.* Given Mr. Long's presence at the point of ingress and egress to 24 Preble Street, the Defendants argue that Officer Abbott was justified in concluding that Mr. Long was loitering. *Id.* Accordingly, the Defendants contend that because Officer Abbott had probable cause to believe that Mr. Long was drinking in public

and loitering, he also had probable cause to arrest Mr. Long for failing to provide identification. *Id.*

In response, Mr. Long asserts that the record fails to establish that Officer Abbott had probable cause to arrest Mr. Long for drinking in public and loitering. *Pl.'s Resp.* at 1–2 (citing, *inter alia*, PSAMF ¶¶ 65–67, which includes Assistant Chief Malloch's deposition testimony concerning whether probable cause existed to arrest Mr. Long). Mr. Long points out that Officer Abbott did not observe him drinking in public or "hindering access of a public way to any person or vehicle." *Id.* at 2. Because Officer Abbott lacked probable cause to suspect that Mr. Long committed any underlying crime, Mr. Long contends that Officer Abbott had no authority to arrest him for refusing to provide identification. *Id.* Therefore, Mr. Long asserts that the arrest violated his right to be free from unreasonable seizures under the Fourth Amendment. *Id.*

The Defendants reply that Mr. Long's opposition to summary judgment "is premised on speculation, inadmissible evidence, and conclusory assertions, but not upon a genuine issue of material fact." *Defs.' Reply* at 1. The Defendants assert, for instance, that Mr. Long has not demonstrated that there was no sweat line on the beer can, nor has he demonstrated that there was no sign prohibiting drinking within 200 feet of 24 Preble Street. *Id.* More generally, the Defendants contend that Mr. Long has presented no evidence that would undermine Officer Abbott's stated belief that a sign was posted nearby. *Id.*

24

Finally, the Defendants take issue with Mr. Long's reliance on certain statements by Assistant Chief Vernon Malloch. *Id.* at 2. They point out that Mr. Long cannot rely on Assistant Chief Malloch's opinions because Mr. Long did not designate him as an expert. *Id.* at 2 (citing *Harriman v. Hancock County*, 627 F.3d 22, 33 (1st Cir. 2010)).

### b.      Search Incident to Arrest

The Defendants assert that "[i]t is established law that a law enforcement officer may search a person incident to a valid arrest without the requirement of a warrant." *Defs' Mot.* at 7 (quoting *United States v. Robinson*, 414 U.S. 218, 235 (1973)). The Defendants acknowledge that Officer Abbott removed Mr. Long's wallet before he announced that Mr. Long was under arrest. *Id.* However, they contend that Officer Abbott's conduct was nevertheless a lawful search incident to arrest because Officer Abbott had probable cause to arrest Mr. Long for failing to provide identification at the time he removed Mr. Long's wallet. *Id.*

Mr. Long responds that Officer Abbott performed an unlawful search when he reached into his pocket to extract his wallet. *Pl.'s Resp.* at 2–3. He argues that the search was not incident to an arrest because Officer Abbott conducted the search before arresting him. *Id.* at 4. Moreover, Mr. Long claims that the search did not constitute a permissible frisk under *Terry v. Ohio*, 392 U.S. 1 (1968), because Officer Abbott was not concerned for his safety or the safety of others. *Id.* at 3–4.

In reply, the Defendants state that a search that occurs immediately before a formal arrest is valid provided that probable cause existed before the search. *Defs.'*

*Reply* at 2–3 (collecting cases).  Because Officer Abbott demonstrated that he had probable cause at the time he removed Mr. Long's wallet, and because the formal arrest occurred immediately thereafter, the Defendants argue that the search was valid under the Fourth Amendment as incident to arrest.  *Id.* at 3.

### c.     Excessive Force

The Defendants contend that Officer Abbott's alleged actions cannot support a claim of excessive force under the Fourth Amendment because his alleged actions were "not objectively unreasonable as a matter of law."  *Defs.' Mot.* at 8.  They point out that the Supreme Court has held that "not every push or shove" constitutes excessive force, *id.* (citing *Graham v. Connor*, 490 U.S. 386, 396 (1989)), and liken the case to *Fernandez-Salicrup v. Figueroa-Sancha*, 790 F.3d 312 (1st Cir. 1990), in which the First Circuit held that an officer did not use excessive force when he shoved an individual face-first into a wall for a minor violation, even though the individual did not pose an immediate threat to the officer.  *Id.* at 8–9.  Moreover, they claim that the amount of force that Officer Abbott used can be "reliably informed by the fact" that Mr. Long did not suffer any injuries or seek any medical treatment.  *Id.* at 10 (citing *Dean v. City of Worcester*, 924 F.2d 364, 369 (1st Cir. 1991)).   Therefore, the Defendants claim that Officer Abbott's use of force was not objectively unreasonable, and that they are entitled to summary judgment.  *Id.* at 11.

In response, Mr. Long argues that Officer Abbott's "gratuitous and completely unnecessary use of force" violated his Fourth Amendment rights.  *Pl.'s Resp.* at 4–8.  First, Mr. Long argues that whether the use of force violates the Fourth Amendment

"is largely informed by the gravity of the crime[.]"  *Id.* at 5.  Thus, he attempts to distinguish *Fernandez-Salicrup* arguing that in that case, the plaintiff was suspected of "rioting and causing aggravated damages," whereas Mr. Long merely refused to produce identification.  *Id.* at 4.  Likewise, Mr. Long points out that the officers in *Dean* suspected that the arrestee was an escaped armed felon.  *Id.* at 5–6.  Mr. Long also contends that serious harm is not necessary in order to make out a claim of excessive force, and therefore the fact that Mr. Long did not report any injury does not preclude his excessive force claim.  *Id.* at 6 (citing *Lester v. Chicago*, 830 F.2d 706, 714 (7th Cir. 1987)).

Moreover, Mr. Long asserts that Officer Abbott's use of force served "no legitimate penological purpose[.]"  *Id.* at 7.  Instead, Mr. Long surmises that Officer Abbott "felt justified in meting out some revenge against Mr. Long for refusing to capitulate to his demands."  *Id.* at 5.  Mr. Long urges the Court to allow a factfinder to determine whether Officer Abbott's shove was sufficiently gratuitous and unnecessary to constitute a violation of his Fourth Amendment rights.  *Id.* at 7–8 (citing *Burbank v. Davis*, 227 F. Supp. 2d 176, 186 (D. Me. 2002) ("if [the officer] gratuitously and unnecessarily hit and manhandled [the arrestee] for no legitimate law enforcement reason it could not be objectively reasonable for it to be non-apparent to him that his actions violated [the arrestee's] rights")).

The Defendants reply that Mr. Long fails to distinguish *Fernandez-Salicrup*, which they characterize as controlling.  *Defs.' Reply* at 3.  They also assert that Mr. Long's reliance on *Burbank* is misplaced because the use of force in that case was

dramatically different from a single push in the back. *Id.* The Defendants admit that Officer Abbott's alleged push of Mr. Long "may have been unnecessary, but it was not unreasonable." *Id.* (citing *Fernandez-Salicrup*, 790 F.3d at 327).

### 2.   Supervisory Liability Claim Against Chief Sauschuck

Next, the Defendants assert that the summary judgment record does not support a claim of supervisory liability against Chief Sauschuck. *Defs.' Mot.* at 11–13. They contend that there is no evidence that Chief Sauschuck directly participated in the events on August 9, 2014, or that he was deliberately indifferent in a manner that had "some causal connection to the subsequent tort." *Id.* at 11–12 (citing *Sanchez v. Pereira-Castillo*, 590 F.3d 31, 49 (1st Cir. 2009)).   In particular, the Defendants claim that Chief Sauschuck was not aware of "any custom or practice of the Portland police officers generally—or Officer Abbott in particular—engaging in any of the violations alleged by Mr. Long" or any "deficiencies" in training, supervision, or hiring that would cause the alleged violations. *Id.* at 12. As such, the Defendants request the Court to enter summary judgment on all claims against Chief Sauschuck. *Id.* at 13.

According to Mr. Long, on the other hand, Chief Sauschuck is liable as a supervisor because he has "completely abdicated his duty to supervise and train his officers in the field" on the issue of probable cause. *Pl.'s Resp.* at 8–9. He asserts that Chief Sauschuck's deposition testimony evidences a deliberate indifference to the constitutional rights of the people with whom his officers interact, and that "such deliberate indifference was the moving force behind the constitutional violations

complained of in this case." *Id.* at 9. Therefore, Mr. Long contends that he may maintain his claims against Chief Sauschuck under a theory of supervisory liability. Mr. Long asserts no caselaw in support of his assertions.

In reply, the Defendants assert that Mr. Long mischaracterizes Chief Sauschuck's testimony. *Defs.' Reply* at 4. They repeat that "there is no evidence of deliberate indifference on the part of Chief Sauschuck" and that he was "not aware of any custom or practice of Portland police officers generally—or Officer Abbott in particular—engaging in any of the violations alleged by Mr. Long." *Id.* at 5.

### 3.   Municipal Liability Claim Against the City of Portland

The Defendants explain that governmental entity liability under 42 U.S.C. § 1983 requires that the governmental entity adhere to a policy or custom that causes the constitutional violation at issue. *Defs.' Mot.* at 13 (citing *City of Canton, Ohio v. Harris*, 489 U.S. 378, 385 (1989)). Moreover, the Defendants assert that "the policy or custom must be the result of acts or omissions of the municipality's policymakers that exhibit 'deliberate indifference' to the rights of the municipality's inhabitants." *Id.* (quoting *City of Canton*, 489 U.S. at 387–90). According to the Defendants, Mr. Long provides no evidence of such deliberate indifference, much less a policy, custom, or practice that was the motivating force behind the alleged violations. *Id.* at 14.

In response, Mr. Long defends his claims against the city of Portland on a theory of municipal liability. *Pl.'s Resp.* at 10. In particular, Mr. Long asserts that Chief Sauschuck is a policy-maker for the city of Portland whose "policy of abdication

and ignorance of the law" was a moving force behind the alleged constitutional violations. *Id.* Again, Mr. Long cites no caselaw in support of his assertions.

### 4. Qualified Immunity

The Defendants contend that, even assuming the truth of Mr. Long's allegations, qualified immunity protects Officer Abbott and Chief Sauschuck. *Defs.' Mot.* at 14–17. With respect to Chief Sauschuck, they argue that "there is no record evidence to suggest that he had any reason to suspect that any of Mr. Long's clearly-established rights would be violated." *Id.* at 16. Turning to Officer Abbott, the Defendants claim that, given the specific factual context of the case, "it cannot be said that every reasonable official would have understood that Officer Abbott's actions violated Mr. Long's clearly-established constitutional rights." *Id.* Accordingly, the Defendants state that Officer Abbott and Chief Sauschuck are entitled to summary judgment on all of Mr. Long's § 1983 claims.

By contrast, Mr. Long contends that qualified immunity does not shield Officer Abbott or Chief Sauschuck. *Pl.'s Resp.* at 10–12. With respect to Officer Abbott, Mr. Long asserts that no reasonable officer could have believed (1) that there was probable cause to arrest Mr. Long for drinking in public or loitering, (2) that shoving Mr. Long in the back was necessary, appropriate, reasonable, or lawful, or (3) that conducting a non-consensual search of an individual was lawful without reasonable suspicion that the individual was armed or dangerous. *Pl.'s Resp.* at 10–11. With respect to Chief Sauschuck, Mr. Long argues that the record shows that Chief Sauschuck "completely abdicated any training or supervision of his officers" with

respect to the alleged constitutional violations and that "such deliberate indifference was the moving force behind the constitutional violations. *Id.* at 11–12. Therefore, Mr. Long insists that qualified immunity does not shield Officer Abbott or Chief Sauschuck's conduct. *Id.* at 10–12.

The Defendants reply that, based on the record facts, "[i]t is at least arguable…that Officer Abbott had probable cause for an arrest and that he was therefore justified in removing Mr. Long's wallet and using some amount of force to effect the arrest." *Defs' Reply.* at 5. Additionally, the Defendants point out that the PPD had policies in place dealing with arrests, searches, and the use of force and that Chief Sauschuck did not "completely abdicate[] any training or supervision of his officers" as Mr. Long suggests. *Id.* at 6. Therefore, the Defendants conclude that qualified immunity shields Officer Abbott and Chief Sauschuck. *Id.* at 6.

### 5.   Mr. Long's State Law Claims

#### a.   Notice Under the Maine Tort Claims Act

The Defendants assert that Mr. Long's state tort law claims against Officer Abbott—namely assault and unlawful arrest—fail because Mr. Long did not give timely notice pursuant to the MTCA. *Defs.' Mot.* at 17 (citing 14 M.R.S. § 8107). The Defendants explain that the MTCA required Mr. Long to file written notice of the claim within 180 days after the claim accrued. *Id.* According to the Defendants, this meant that Mr. Long needed to file a notice of claim on or before February 5, 2015. However, the Defendants allege that "Mr. Long admits that his notice of claim was not mailed to the Portland Police Department until February 20, 2015 and not

received by the department until February 23, 2015." *Id.* at 18.  Therefore, the Defendants argue that Mr. Long's tort claims are barred.  *Id.*

Mr. Long argues in response that his December 4, 2014 letter to the PPD "constitutes substantial compliance with" the notice requirements of the MTCA.  *Pl.'s Resp.* at 12.  In particular, Mr. Long asserts that the December 4 letter provided his name and address, a concise statement of the basis of his claim, the name and address of any governmental employee involved, and a concise statement of the nature and extent of the injury he claimed that he suffered.  *Id.* (citing *McCarthy v. Inhabitants of the Town of Kennebunkport*, 366 F. Supp. 2d 165, 168 (D. Me. 2005)).  Because the December 4 letter complied with the Act, and because he sent the letter within the 180-day period, Mr. Long contends that the MTCA does not bar his state tort law claims.  *Id.*

In reply, the Defendants repeat that Mr. Long admitted that he submitted his only notice of claim on February 20, 2015.  *Defs.' Reply* at 6.  Moreover, the Defendants argue that Mr. Long's reliance on the December 4, 2014 letter is insufficient because he did not address the letter to the city clerk, treasurer, or manager pursuant to ME. R. CIV. P. 4(d)(6).  *Id.*  The Defendants further contend that the letter does not otherwise comply with the notice requirements set forth in the MTCA.  *Id.*

b.    **Absolute Discretionary Function Immunity**

Finally, the Defendants argue that even if Mr. Long gave timely notice, his state law claims are barred by the immunity provisions of the MTCA, 14 M.R.S. §

8101 *et seq.* (2003). *Defs.' Mot.* at 18–19. The Defendants state that "discretionary immunity…applies unless the defendants' conduct 'clearly exceeded, as a matter of law, the scope of any discretion [they] could have possessed in [their] official capacity as [police officers].'" *Id.* at 18 (alterations in original) (quoting *Polley v. Atwell*, 581 A. 2d 410, 414 (Me. 1990)). According to the Defendants, Officer Abbott's alleged actions all fall within the scope of his discretion as a law enforcement officer, and thus he is entitled to summary judgment on Mr. Long's tort claims. *Id.* at 19.

By contrast, Mr. Long asserts that discretionary function immunity does not shield the Defendants because no reasonable officer could have believed that there was probable cause to make the arrest. *Pl.'s Resp.* at 12.

## IV. LEGAL STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A fact is "material" if it "has the potential to change the outcome of the suit." *Tropigas de Puerto Rico, Inc. v. Certain Underwriters at Lloyd's of London*, 637 F.3d 53, 56 (1st Cir. 2011) (quoting *Borges ex rel. S.M.B.W. v. Serrano-Isern*, 605 F.3d 1, 5 (1st Cir. 2010)). A dispute is "genuine" if "a reasonable jury could resolve the point in favor of the nonmoving party." *Id.* (quoting *McCarthy v. Nw. Airlines, Inc.*, 56 F.3d 313, 315 (1st Cir. 1995)).

Once this evidence is supplied by the moving party, the nonmovant must "produce 'specific facts, in suitable evidentiary form, to . . . establish the presence of a trialworthy issue.'" *Triangle Trading Co., Inc. v. Robroy Indus., Inc.*, 200 F.3d 1, 2

33

(1st Cir. 1999) (quoting *Morris v. Gov't Dev. Bank of Puerto Rico*, 27 F.3d 746, 748 (1st Cir. 1994)).   In other words, the non-moving party must "present 'enough competent evidence' to enable a factfinder to decide in its favor on the disputed claims." *Carroll v. Xerox Corp.*, 294 F.3d 231, 237 (1st Cir. 2002) (quoting *Goldman v. First Nat'l Bank of Boston*, 985 F.2d 1113, 1116 (1st Cir. 1993)).   The Court then "views the facts and draws all reasonable inferences in favor of the nonmoving party."   *Ophthalmic Surgeons, Ltd. v. Paychex, Inc.*, 632 F.3d 31, 35 (1st Cir. 2011).   However, the Court "afford[s] no evidentiary weight to 'conclusory allegations, empty rhetoric, unsupported speculation, or evidence which, in the aggregate, is less than significantly probative.'"   *Tropigas*, 637 F.3d at 56 (quoting *Rogan v. City of Boston*, 267 F.3d 24, 27 (1st Cir. 2001)); *accord Sutliffe v. Epping Sch. Dist.*, 584 F.3d 314, 325 (1st Cir. 2009).

## V.   DISCUSSION

### A.   Count I: Mr. Long's Constitutional Claims

#### 1.   Probable Cause to Arrest Mr. Long

Mr. Long alleges that Officer Abbott, acting under color of state law, violated his right "to be free from arrest except upon a finding of probable cause that he had committed a crime[.]"   *Fourth Am. Compl.* ¶ 53.   The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures[.]"   U.S. Const. amend. IV.   A warrantless arrest by a law enforcement officer is reasonable under the Fourth Amendment where it is based on probable cause. *See Brinegar v. United States,* 338

34

U.S. 160, 175–176 (1949); *Robinson v. Cook*, 706 F.3d 25, 33 (1st Cir. 2013).  "Probable cause for an arrest 'exists when the arresting officer, acting upon apparently trustworthy information, reasonably concludes that a crime has been (or is about to be) committed and that the putative arrestee likely is one of the perpetrators.'" *United States v. Brown*, 500 F.3d 48, 56 (1st Cir. 2007) (quoting *Acosta v. Ames Dep't Stores, Inc.,* 386 F.3d 5, 9 (1st Cir. 2004)).  Whether probable cause exists depends upon the reasonable conclusion to be drawn from the facts known to the arresting officer at the time of the arrest.  *Devenpeck v. Alford*, 543 U.S. 146, 152 (2004) (citing *Maryland v. Pringle,* 540 U.S. 366, 371 (2003)).

In this case, Officer Abbott arrested Mr. Long for failing to produce identification in violation of 17-A M.R.S. 15-A(2).  The Defendants attest that Officer Abbott was justified in asking for Mr. Long's identification because Officer Abbott had probable cause to believe that Mr. Long was drinking in public and loitering.  *Defs.' Mot.* at 3–6.  The Court addresses the Defendants' justifications in turn.

### a.   Drinking in Public

Under Maine law:

> A person is guilty of public drinking if the person drinks liquor in any public place within 200 feet of a notice posted conspicuously in the public place by the owner or authorized person that forbids drinking in the public place or after being forbidden to do so personally by a law enforcement officer, unless the person has been given permission to do so by the owner or authorized person.

17 M.R.S. § 2003-A(2).  Under this statute, probable cause exists to arrest an individual for public drinking when an officer reasonably concludes that the

individual was (1) drinking liquor,[34] (2) in a public place, (3) within 200 feet of a notice posted conspicuously in the public place that forbids drinking in the public place or after being forbidden to do so personally by a law enforcement officer.

The parties do not dispute that the front steps of 24 Preble Street constitute a "public place" for purposes of the statute.  Rather, the central disputes turn on whether Officer Abbott reasonably believed that Mr. Long was drinking, and whether he reasonably believed that the conduct occurred within 200 feet of a posted notice. With respect to whether Officer Abbott reasonably believed the Mr. Long was drinking, the summary judgment facts indicate that shortly before midnight, Officer Abbott and another officer received a call from dispatch to respond to a complaint of four to five males drinking at 24 Preble Street.  When the officers arrived at that address, they encountered Mr. Long and another male sitting on the front steps. There were "several cans of beer on or near the stairway"; the closest was an open can seven feet from Mr. Long.

When viewed in the light most favorable to Mr. Long, the record compels the conclusion that there is a genuine issue of material fact as to whether Officer Abbott could have reasonably believed that Mr. Long was consuming alcohol from a can of beer seven feet away from him.  If the open can of beer had been within arm's length of Mr. Long, an officer could reasonably assume that he had been drinking from it, but people typically do not place a beverage seven feet away, so that they would have to stand up and retrieve the can before taking a sip.

---

[34]    The statute defines "liquor" broadly as any "alcoholic beverage…intended for human consumption, which contains more than ½ of 1% of alcohol by volume."  17 M.R.S. § 2003-A(1)(B).

36

Officer Abbott asserts that he noticed a "sweat line" on the beer cans.  If believed, this would tend to prove not only that the cans contained beer but that the beer cans had been recently opened.  Mr. Long counters that Officer Abbott could not have noticed any "sweat lines" because of the poor lighting around 24 Preble Street and because Officer Abbott did not approach within seven feet of any of the beer cans.  PSAMF ¶ 25.  Based on this contradictory evidence, there is a second genuine dispute regarding whether Officer Abbott observed "sweat lines" on the beer cans.

Regardless of whether Officer Abbott noticed any "sweat lines," it is arguable that the officers nevertheless had probable cause to suspect that Mr. Long was drinking because he was sitting among open beer cans at the exact address where the officers received a complaint about a group of males drinking.  But the complaint of four or five males drinking beer did not match the two males Officer Abbott observed sitting on the steps of 24 Preble Street.

The record reveals that Mr. Long informed the officers that he was not drinking and that the beer cans were already on the stairway before he arrived.  This fact is not dispositive.  Although a suspect's denial may form part of a police officer's probable cause determination, "[a] reasonable police officer is not required to credit a suspect's story." *Cox v. Hainey*, 391 F.3d 25, 32 n.2 (1st Cir. 2004); *see also Emanuel v. Cty. of Wayne*, 652 Fed. Appx. 417 (6th Cir. 2016) (citing *Criss v. City of Kent*, 867 F.2d 259, 263 (6th Cir. 1988) (stating that a police officer "is under no obligation to give any credence to a suspect's story nor should any plausible explanation in any sense require the officer to forego arrest pending further investigation if the facts as

37

initially discovered provide probable cause")).  Yet, taken as a whole, the Court concludes that there are genuine issues of material fact as to whether Officer Abbott had probable cause to believe that Mr. Long had been drinking alcohol.

Even assuming that Officer Abbott had probable cause to believe that Mr. Long was drinking, summary judgment is still inappropriate because the Court cannot determine, based on the record, whether Officer Abbott reasonably believed that he was within 200 feet of a sign prohibiting drinking when he arrested Mr. Long.  As an initial matter, the record is not clear whether there actually was a sign within 200 feet of 24 Preble Street at the time of the arrest.  The parties agree that Mr. Long returned to the area shortly after the arrest but could not locate a sign within 200 feet.  Moreover, Mr. Long attests that he has lived, visited, and worked as a police officer in Portland over the past forty-five years and has never personally observed a location in the city where there are signs prohibiting drinking posted at intervals of 200 feet.  Viewing the facts in the light most favorable to Mr. Long, the Court assumes for purposes of summary judgment that there was no sign within 200 feet of where Officer Abbott arrested Mr. Long.

Nevertheless, Officer Abbott claims that he believed there was a sign within 200 feet of 24 Preble Street at the time he arrested Mr. Long.  DSMF ¶ 9.  A law enforcement officer's mistaken belief of fact may legally support a determination of probable cause as long as the mistake was objectively reasonable.  *See Liser v. Smith*, 254 F. Supp. 2d 89, 97 (D.D.C. 2003) ("[W]hile an objectively reasonable mistake of fact can legally support a determination of probable cause, a mistake that is the

38

product of the government's willful ignorance, investigative negligence, or is otherwise unreasonable, cannot"); *see also Sherouse v. Ratchner*, 573 F.3d 1055, 1059 (10th Cir. 2009) ("[A]n officer's reasonable but mistaken understanding of the *facts* justifying a search or seizure does not negate the legitimacy of the probable cause determination") (emphasis in original).   The question reduces to whether it was objectively reasonable for Officer Abbott to believe that there was a sign prohibiting drinking within 200 feet of where he arrested Mr. Long.

The existing record does not provide the Court with a sufficient foundation to assess the reasonableness of Officer Abbott's mistaken belief.   The record merely reflects that Officer Abbott had served as a patrol officer with the PPD since 2011, and that he regularly patrolled the area around 24 Preble Street.   Whether there was such a sign is an objective fact.   A factfinder could reasonably infer that the absence of evidence of such a sign indicates that there was no such sign.   This is particularly true as Officer Bennis went off to locate a sign and there is no evidence that he found one.   With all of these facts, a jury could conclude that there was in fact no sign prohibiting drinking within 200 feet of Preble Street and that no reasonable law enforcement official in Officer Abbott's position would believe that there was such a sign, if none existed.   Without more, the Court is unwilling to say, as a matter of law, that Officer Abbott had probable cause to arrest Mr. Long for drinking in public.

### b.    Loitering

The Defendants have a fallback.   They assert that Officer Abbott was also justified in requesting Mr. Long's identification because Officer Abbott had probable

cause to believe that Mr. Long was loitering. *Defs.' Mot.* at 6 ("[T]he information available to Officer Abbott was sufficient to warrant a prudent person in believing that Mr. Long was guilty of loitering"). Portland's Code of Ordinances defines loitering as "remaining in essentially one (1) location, seated or standing, and shall include the concept of spending time idly; to be dilatory; to linger; to stay; to saunter; to delay; and to stand around." City of Portland, Me., Code of Ordinances § 17-1(a)(1). Under the Portland Code:

> (b)     It shall be unlawful for any person to loiter either alone and/or in consort with others in a public place in such manner as to:
>
>> (1)     Obstruct any public street, public highway, public sidewalk or any other public place or building by hindering or impeding or tending to hinder or impede the free and uninterrupted passage of vehicles, traffic or pedestrians.
>>
>> (2)     Commit in or upon any public street, public highway, public sidewalk or any other public place or building any act or thing which is an obstruction or interference to the free and uninterrupted use of property or with any business lawfully conducted by anyone in or upon or facing or fronting on any such public street, public highway, public sidewalk or any other public place or building, all of which prevents the free and uninterrupted ingress and egress therein, thereon, and thereto;…
>
> (c)     When any person causes or commits any of the conditions enumerated in subsection (b) herein, a police officer or any law enforcement officer shall order that person to stop causing or committing such conditions and to move on or disperse. Any person who fails or refuses to obey such orders shall be guilty of a violation of this section.

*Id.* § 17-1(b)(1)–(2); (c). Hence, an individual is guilty of loitering if the person (1) loiters in a manner set forth in the ordinance and (2) refuses to obey an officer's directive "to move on or disperse."

Viewed charitably to the Defendants, the record presents some evidence that Mr. Long loitered in a manner set forth in the city ordinance. By lingering on the stoop of 24 Preble Street with Mr. Bowers, Mr. Long was arguably "tending to hinder" the free and uninterrupted passage of pedestrians into the building. However, for purposes of this motion, the Court must view the evidence in the light most favorable to the Plaintiff, and Mr. Long asserts as a matter of fact that neither he nor Mr. Bowers was blocking entry to or exit from the building, PSAMF ¶ 23; DRPSAMF ¶ 23, and no one complained that they were blocking access to the building. PSAMF ¶ 22; DRPSAMF ¶ 22. Furthermore, Mr. Bowers and Mr. Long were but two people sitting on a stoop about ten feet across. PSAMF ¶ 21; DRPSAMF ¶ 21. Even if it is theoretically possible that Mr. Long was loitering, it is equally clear that whether he was doing so raises a genuine issue of material fact that must be resolved by a jury.

In addition, the Portland Code makes clear that Mr. Long could not be guilty of the offense of loitering until he refused to obey an order to "move on or disperse." Based on the summary judgment facts, Mr. Long never ignored an order to "move on or disperse"; indeed, Officer Abbott never ordered Mr. Long to vacate the area. Consequently, Officer Abbott could not have established probable cause to believe that Mr. Long committed the offense of loitering, nor could he use the offense of loitering as a basis to ask for Mr. Long's identification. Therefore, as the record currently stands, the Court refuses to order summary judgment on Mr. Long's claim of wrongful arrest in Count I.

### 2.    Warrantless Search

Mr. Long next alleges that Officer Abbott, acting under color of state law, violated his right "to be free from unreasonable, warrantless searches[.]" *Fourth Am. Compl.* ¶ 53.  It is settled law that a search of a person incident to a lawful arrest is a traditional exception to the warrant requirement of the Fourth Amendment. *United States v. Robinson*, 414 U.S. 218, 224 (1973).  "[W]hether a formal arrest occurred prior to or followed 'quickly on the heels' of the challenged search does not affect the validity of the search *so long as the probable cause existed prior to the search.*"[35]  *United States v. Bizier*, 111 F.3d 214, 217 (1st Cir. 1997) (emphasis added) (quoting *Rawlings v. Kentucky*, 448 U.S. 98, 111 (1980)).  The validity of the search in this case thus turns on whether Officer Abbott had probable cause to arrest Mr. Abbott prior to reaching into his pocket and removing his wallet.  However, the Court is unable to determine whether Officer Abbott had probable cause to arrest Mr. Long for failing to provide identification because the Court cannot say whether Officer Long had probable cause to believe that Mr. Long was drinking in public or loitering in violation of state and municipal law.  Accordingly, the Court denies the Defendants' motion for summary judgment on Mr. Long's claim of an illegal search in Count I.

### 3.   Excessive Force

---

[35]   In his response to the Defendants' statement of material facts, Mr. Long argues that Officer Abbott did not conduct the search until after he was placed under arrest.  PRDSMF ¶ 23.  Later, in his statement of additional material facts, Mr. Long asserts the opposite—namely that Officer Abbott searched him before he was under arrest.  PSAMF ¶ 100.  In his memorandum in opposition to summary judgment, Mr. Long argues that the search occurred before the arrest.  *See Pl's. Resp.* at 4.  Nevertheless, both of Mr. Long's conflicting factual accounts have the arrest and the search occurring almost simultaneously.  As a result, it does not matter for purposes of the Court's analysis whether the arrest occurred before or after the challenged search.  *See United States v. Bizier*, 111 F.3d 214, 217 (1st Cir. 1997) ("[W]hether a formal arrest occurred prior to or followed 'quickly on the heels' of the challenged search does not affect the validity of the search so long as the probable cause existed prior to the search").

The Fourth Amendment guarantees citizens the right "to be secure in their persons…against unreasonable…seizures."   U.S. CONST. amend. IV.   Mr. Long contends that Officer Abbott, acting under color of state law, violated his rights to "bodily integrity" and to "be free of the use of unreasonable force[.]"   *Fourth Am. Compl.* ¶ 53.   An excessive force claim under the Fourth Amendment requires a showing that "the defendant employed force that was unreasonable under all the circumstances."   *Morelli v. Webster,* 552 F.3d 12, 23 (1st Cir. 2009).   "The 'reasonableness' inquiry in an excessive force case is an objective one: whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation."   *Graham v. Connor,* 490 U.S. 386, 397 (1989).   Its measurement requires "careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight."   *Id.* at 396; *Morelli,* 552 F.3d at 23.   "[T]he reasonableness test established in *Graham* remains the applicable test for determining when excessive force has been used, including those cases where officers allegedly lack probable cause to arrest."   *Jones v. Parmley*, 465 F.3d 46, 62 (2nd Cir. 2006).

"The reasonableness of force used is determined not only with reference to the need for the arrest and for reducing risk to the officers and the public but also with reference to the manner in which the arrest is effected."   *Dean*, 924 F.2d at 369.   "Not every push or shove" will reach the level required for a viable excessive force claim.

43

*Id.* at 368.  Additionally, "[i]t has long been recognized that 'the right to make an arrest…necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it.'"  *Id.* at 368–69 (quoting *Graham*, 490 U.S. at 396). Furthermore, because "'police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation,' the reasonableness of the officer's belief as to the appropriate level of force should be judged from that on-scene perspective."  *Saucier v. Katz*, 533 U.S. 194, 205 (2001) (quoting *Graham*, 490 U.S. at 396)).  As the Supreme Court noted in *Saucier*, the *Graham* Court therefore "set out a test that cautioned against the '20/20 vision of hindsight' in favor of deference to the judgment of reasonable officers on the scene."  *Id.* (quoting *Graham*, 490 U.S. at 396).

The Defendants analogize the present case to two other cases in which the First Circuit rejected claims of excessive force.  *Defs.' Mot.* at 6–9.  The Court agrees with Mr. Long that Officer Abbott's reference to *Dean v. City of Worcester* is largely inapposite.  Although the force that the officers used in that case—i.e., pushing an individual against a wall—is somewhat similar to the force Officer Abbott allegedly used against Mr. Long, the similarities end there.  *Dean*, 924 F.2d at 366.  In *Dean*, the officers believed that they were arresting an escaped armed felon.  *Id.*  Here, Officer Abbott arrested Mr. Long for the relatively benign offence of failing to provide identification.  Officer Abbott had no grounds to believe that Mr. Long was armed or posed a flight risk.  The circumstances in *Dean*, including the severity of the crime,

44

the potential threats to officers and the public, and the possibility of flight, necessarily expand the scope of acceptable force beyond what would be considered reasonable in the present case.  Because of the critical dissimilarities between the two cases, the Defendants' analogy to *Dean* is unavailing.

The Defendants' analogy to *Fernandez-Salicrup v. Figueroa-Sancha* is closer. Although there are some similarities between Mr. Long's version of the facts in this case and the facts in *Fernandez-Salicrup*, there are more significant differences.  In *Fernandez-Salicrup*, the then-Governor of Puerto Rico, Luis Fortuño, attended an event at a housing project across from a school.  790 F.3d at 315.  A number of students objected to the Governor's presence, and to protest, they "threw objects such as eggs, rocks, and tree branches at the PRPD (Puerto Rico Police Department) officers guarding the event and at cars passing through the street."  *Id.* at 315–16.  In response, Luis Díaz-Portalatin, the PRPD Canóvanas District Commander, ordered the police to enter the school, quiet the situation, and arrest those responsible for throwing objects.  *Id.* at 316.  One of the Defendants, Ginnette Rosado, was one of the police officers who responded to District Commander Díaz's order.  *Id.*  As Officer Rosado and the other officers entered the school, the situation "turned chaotic."  *Id.* All the protesting students, throwers and not, ran to the school, and Valerie Fernández-Ramos—who was protesting but not throwing—ran too.  *Id.*  As she entered a hallway, Ms. Fernández closed the gate behind her and remained nearby. *Id.*  As Officer Rosado approached the closed gate, she asked Ms. Fernández to open it, and Ms. Fernández immediately complied.  *Id.*

45

When Officer Rosado entered, she spoke to Ms. Fernández "in a rough manner" and pushed her aside. *Id.* Ms. Fernández was not happy at being rudely treated, and she told Officer Rosado not to talk to her that way. *Id.* Officer Rosado told Ms. Fernández that she could speak to her any way she liked, whereby Ms. Fernández again expressed her displeasure. *Id.* At this point, Officer Rosado "shoved" Ms. Fernández face-first against wall and placed a handcuff on her left wrist.[36] *Id.*

The First Circuit said that Officer Rosado arrested Ms. Fernández for obstructing government administration and/or disorderly conduct and it conceded that neither is "a severe crime." *Id.* at 326–27. The First Circuit also acknowledged that Ms. Fernández never posed an immediate threat to Officer Rosado or others. *Id.* at 327. Accordingly, "only a minimal level of force by Rosado would be reasonable under the circumstances." *Id.* Noting that Officer Rosado shoved Ms. Frenández face-first against a wall and proceeded to handcuff her, the *Fernández-Salicrup* Court stated that there was "no evidence that this technique deviated from standard police practice." *Id.*

Like the offenses in *Fernández-Salicrup*, whatever Officer Abbott was arresting Mr. Long for in the present case, it was "not a severe crime." *Id.* at 327. Moreover, no evidence indicates that Mr. Long posed an immediate threat to the officer or others. Thus, like *Fernández-Salicrup*, Officer Abbott was entitled to use "only a minimal level of force" in effecting Mr. Long's arrest. *Id.* Unlike *Fernández-*

---

[36]     The First Circuit opinion goes on to describe Ms. Fernández slipping through the nearby gate and escaping, which is where the factual similarities with Mr. Long's case end. *Fernández-Salicrup*, 790 F.3d at 316.

*Salicrup*, however, there were no surrounding circumstances that would have justified Officer Abbott's push.   The scene was not chaotic, no items—some dangerous—had been thrown at the Governor, and Mr. Long was not surrounded by a group of fellow students.   Here, Officer Abbott ordered Mr. Long to stand up, turn around, and put his hands behind his back, and as Mr. Long was complying with Officer Abbott's order, Officer Abbott shoved him from behind with enough force to cause Mr. Long to land face-first on the stairs.   In contrast with *Fernández-Salilcrup*, here, there is no indication that Officer Abbott's shove complied with any standard police technique.   In fact, the Defendants offer no explanation for why Officer Abbott found it necessary to shove Mr. Long face-first onto the stairs.   There is no evidence on this record that Officer Abbott's shove was necessary to effect the arrest since Mr. Long was attempting to comply with Officer Abbott's order when Officer Abbott shoved him.

The record allows the inference that Officer Abbott simply lost his temper with Mr. Long.   When Mr. Long first refused to produce identification, Officer Abbott stated, "Oh, we got a wise guy here."   He then swore at Mr. Long:   "Let's see some fucking ID or you're going to fucking jail."   When Mr. Long protested Officer Abbott's decorum and language and questioned why he was going to jail, Officer Abbott replied "for not providing ID."   When Mr. Long continued to refuse to produce his identification and told Officer Abbott that he was going to videotape the encounter, it was then that Officer Abbott ordered Mr. Long to stand up and, when he did, shoved him down.

Although *Fontana v. Haskin*, 262 F.3d 871 (9th Cir. 2001), is not a First Circuit case, it states a common sense legal principle that the First Circuit would likely endorse: "Gratuitous and completely unnecessary acts of violence by the police during a seizure violate the Fourth Amendment." *Id.* at 880.   *Accord Zucker v. City of Farmington Hills*, 643 Fed. Appx. 555, 568 (6th Cir. 2016) ("[A] totally gratuitous blow with a policeman's nightstick may cross the constitutional line"); *Burbank v. Davis*, 227 F. Supp. 2d 176, 187 (D. Me. 2002).  It is true that the record suggests that Officer Abbott's shove did not cause permanent or even significant injuries to Mr. Long.  However, as the First Circuit has written, "liability may be imposed for the use of excessive force even in the absence of a serious injury." *Bastien v. Goddard*, 279 F.3d 10, 14 (1st Cir. 2002).

Accepting Mr. Long's version of the events, Officer Abbott has offered no justification for shoving Mr. Long onto the steps in these circumstances, and the Court can conceive of none.  Therefore, the Court will not grant summary judgment in favor of Officer Abbott on the excessive force claim.

## B.    Count II: Supervisory Liability Against Chief Sauschuck

In Count II, Mr. Long asserts a 42 U.S.C. § 1983 claim against Chief Sauschuck premised on a theory of supervisory liability.  *Fourth Am. Compl.* ¶¶ 55–68.  It is settled law that "[g]overnment officials may not be held liable for the unconstitutional conduct of their subordinates under a theory of *respondeat superior*[.]"  *Sanchez v. Pereira-Castillo*, 590 F.3d 31, 49 (1st Cir. 2009) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009)).  Rather, supervisory officials may only be held liable "if the plaintiff

can establish that her constitutional injury resulted from the direct acts or omissions of the official, or from indirect conduct that amounts to condonation or tacit authorization." *Rodriguez-Garcia v. Miranda-Marin*, 610 F.3d 756 (1st Cir. 2010) (citing *Rodriguez-Garcia v. Municipality of Caguas*, 495 F.3d 1, 10 (1st Cir. 2007)). In other words, supervisory liability in the context of § 1983 actions "typically arises in one of two ways: either the supervisor may be a 'primary violator or direct participant in the rights-violating incident,' or liability may attach 'if a responsible official supervises, trains, or hires a subordinate with deliberate indifference toward the possibility that deficient performance of the task eventually may contribute to a civil rights deprivation.'" *Sanchez*, 590 F.3d at 49 (quoting *Camilo-Robles v. Zapata*, 175 F.3d 34, 44 (1st Cir. 1999)).

To establish "deliberate indifference," the plaintiff must "show (1) a grave risk of harm, (2) the defendant's actual or constructive knowledge of that risk, and (3) his failure to take easily available measures to address the risk." *Ramirez-Lluveras v. Rivera-Merced*, 759 F.3d 10, 26 (1st Cir. 2014) (citing *Figueroa-Torres v. Toldeo-Davila*, 232 F.3d 270, 279 (1st Cir. 2000)). This formulation "implies that deliberate indifference alone does not equate with supervisory liability; a suitor also must show causation." *Camilo-Robles v. Hoyos*, 151 F.3d 1, 7 (1st Cir. 1998) (citing *Maldonado-Denis v. Castillo-Rodriguez*, 23 F.3d 576, 582 (1st Cir. 1994)); *see also Guadalupe-Baez v. Pesquera*, 819 F.3d 509 (1st Cir. 2016) ("Causation remains an essential element, and the causal link between a supervisor's conduct and the constitutional violation must be solid"). "This causation requirement 'contemplates proof that the

supervisor's conduct led inexorably to the constitutional violation.'" *Guadalupe-Baez*, 819 F.3d at 515 (quoting *Hegarty v. Somerset County*, 53 F.3d 1367, 1380 (1st Cir. 1995)). "That is a difficult standard to meet but far from an impossible one: a plaintiff may, for example, prove causation by showing inaction in the face of a 'known history of widespread abuse sufficient to alert a supervisor to ongoing violations.'" *Id.* (quoting *Maldonado–Denis*, 23 F.3d at 582). "'[I]solated instances of unconstitutional activity' will not suffice." *Id.* (quoting *Maldonado–Denis*, 23 F.3d at 582).

As an initial matter, Chief Sauschuck was not a "primary violator or direct participant in the rights-violating incident." *See Sanchez*, 590 F.3d at 49. The parties agree that Chief Sauschuck was not present for the incident involving Mr. Long and that he had no physical contact with Mr. Long on the evening of August 9, 2014. DSMF ¶¶ 38, 40; PRDSMF ¶¶ 38, 40. Furthermore, the parties agree that Chief Sauschuck was not involved in the decision whether to arrest Mr. Long, nor was he involved in any of the searches of Mr. Long. DSMF ¶¶ 39, 41; PRDSMF ¶¶ 39, 41.

Moreover, the record does not support a finding that Chief Sauschuck supervised, trained, or hired Officer Abbott "with deliberate indifference toward the possibility that deficient performance of the task eventually may contribute to a civil rights violation." *Sanchez*, 590 F.3d at 49. The parties agree that the PPD maintains policies with regard to arrests, searches, and the use of force. DSMF ¶ 56; PRDSMF ¶ 56. Officer Abbott received training regarding warrantless arrests, the use of force, searches, and requesting identification. DSMF ¶¶ 60–63; PRDSMF ¶¶ 60, 62–63. The Defendants assert that from the time of Chief Sauschuck's employment in 2012

50

through the events on August 9, 2014, he was not aware of any pattern or practice of Officer Abbott or other Portland police officers arresting individuals without probable cause or using excessive force to effect arrests.  DSMF ¶¶ 48, 51–52, 55, 58.  Similarly, Chief Sauschuck maintains that he was not aware of any pattern or practice of Officer Abbott or other Portland police officers requesting identification or searching individuals without a proper justification.  DSMF ¶¶ 49–50, 53–54, 58.

Mr. Long cites no record evidence to rebut Chief Sauschuck's assertions.  Rather, in his response statement of facts, Mr. Long argues that "[t]he only way for Chief Sauschuck to be and remain unaware of any pattern or practice [of the PPD or Officer Abbott] would be for him to turn a blind eye to it[.]"  PRDSMF ¶¶ 48–55, 58.  Furthermore, Mr. Long insists that Chief Sauschuck failed to adequately consider whether Officer Abbott violated Mr. Long's constitutional rights, "despite repeated invitations to do so at his deposition."  *Pl.'s Resp.* at 8; PRDSMF ¶¶ 47–55, 58.  According to Mr. Long, this "underscores a deliberately indifferent attitude toward the conduct of his officers and the rights of persons who come into contact with his officers."  PRDSMF ¶¶ 48–55, 58.

Even looking past Mr. Long's failure to comply with Local Rule 56, which requires parties to "support each denial or qualification by a record citation as required by this rule," D. ME. LOC. R. 56(c), Mr. Long's argument fails on the merits.  The record does not support Mr. Long's view that Chief Sauschuck failed to adequately consider whether Officer Abbott violated Mr. Long's constitutional rights.  The facts indicate that on December 4, 2014, Mr. Long sent a letter entitled

"Complaint of Officer and Department Conduct" along with a statement of facts to Lieutenant Robert Martin of the Internal Affairs Division of the PPD. *Long Letter* at 31. Neither the letter nor the statement of facts specifically mentioned probable cause, excessive force, an illegal search, or an improper request for identification. *Id.* at 31–33. The officer who investigated Mr. Long's complaint determined that Mr. Long intended to allege that Officer Abbott used excessive force and profane and unprofessional language. On July 28, 2015, Chief Sauschuck reviewed the results of the investigation and concluded that these allegations were not sustained. *Id.* at 28–29; DSMF ¶ 46; PRDSMF ¶ 46. When pressed during his deposition why he did not investigate whether Officer Abbott had probable cause to arrest Mr. Long, Chief Sauschuck repeatedly and consistently explained that the District Attorney's office previously determined that Officer Abbott had probable cause for an arrest and that the investigation was based only on Officer Abbott's alleged use of force and improper language. *See Sauschuck Dep.* 13:12–14:17; 16:16–18; 17:7–10; 17:23–18:3; 18:15–20; 19:3–7.

To summarize, the PPD maintains policies with regard to arrests, searches, and the use of force, and Chief Sauschuck was not aware of any pattern or practice among his officers that contravened these policies. Officer Abbott received training regarding warrantless arrests, the use of force, searches, and requesting identification. In this case, Chief Sauschuck relied on the District Attorney's determination that Officer Abbott had probable cause to arrest Mr. Long and reviewed the results of an internal investigation regarding Officer Abbott's alleged

use of excessive force and profane language.  Taken together, these facts do not indicate deliberate indifference on the part of Chief Sauschuck.  Specifically, they do not show "(1) a grave risk of harm, (2) [Chief Sauschuck's] actual or constructive knowledge of that risk, and (3) his failure to take easily available measures to address the risk."  *Ramirez-Lluveras*, 759 F.3d at 26.

Furthermore, the facts do not establish a causal link between a supervisor's conduct and the constitutional violation.  Mr. Long has not shown "inaction in the face of a 'known history of widespread abuse sufficient to alert a supervisor to ongoing violations.'"  *Guadalupe-Baez*, 819 F.3d at 515 (quoting *Maldonado–Denis,* 23 F.3d at 582)).  At most, Mr. Long has potentially identified an "isolated instance[] of unconstitutional activity."  *Id.*  Although any alleged unconstitutional activity in his department should trouble Chief Sauschuck, an isolated instance is insufficient to establish supervisory liability.  *Id.* (quoting *Maldonado–Denis,* 23 F.3d at 582).  Accordingly, the Court concludes that Chief Sauschuck is entitled to summary judgment on Mr. Long's claim of supervisory liability in Count II.

### C.    Count III: Municipal Liability Against the City of Portland

In Count III, Mr. Long asserts a claim of municipal liability against the City of Portland.  *Fourth Am. Compl.* ¶¶69–77.  Like supervisory liability, "municipal liability is not vicarious."  *Estate of Bennett v. Wainwright*, 548 F.3d 155 (1st Cir. 2008); *see also Gaudreault v. Municipality of Salem, Mass.*, 923 F.2d 203, 209 (1st Cir. 1990).  In order to succeed on a claim of municipal liability, a plaintiff must show (1) that the municipality adopted a policy or custom that evidenced a "deliberate

indifference" to the constitutional rights of its inhabitants, and (2) that this policy or custom was the cause of, and moving force behind, the plaintiff's alleged constitutional injury. *See Rodriguez-Garcia,* 610 F.3d at 769 (quoting *Welch v. Ciampa,* 542 F.3d 927, 941 (1st Cir. 2008)); *Young v. City of Providence ex rel. Napolitano*, 404 F.3d 4, 26 (1st Cir. 2005); *Foley v. City of Lowell, Mass.*, 948 F.2d 10, 14 (1st Cir. 1991). As discussed previously, to establish "deliberate indifference," a plaintiff must "show (1) a grave risk of harm, (2) the defendant's actual or constructive knowledge of that risk, and (3) his failure to take easily available measures to address the risk." *Ramirez-Lluveras*, 759 F.3d at 26 (citing *Figueroa-Torres*, 232 F.3d at 279); *see also Bordanaro v. McLeod,* 871 F.2d 1151, 1156 (1st Cir. 1989) (holding that a municipal custom or practice "must be so well settled and widespread that the policymaking officials of the municipality can be said to have either actual or constructive knowledge of it yet did nothing to end the practice").

Mr. Long's perfunctory argument regarding municipal liability cites no caselaw and largely parrots the language of the legal standards set forth above. *Pl.'s Resp.* at 10. Essentially, Mr. Long repeats his claim that Chief Sauschuck refused to evaluate whether Officer Abbott violated Mr. Long's constitutional rights, either during his deposition or in response to Mr. Long's December 4, 2014 letter to Internal Affairs. *Id.* at 8–10. To Mr. Long, this signals "a policy of abdication and ignorance of the law" and "underscore[s] a policy-maker who is deliberately indifferent to the constitutional rights of people his officers deal with on a daily basis." *Id.* at 9–10. Mr. Long concludes that Chief Sauschuck's "deliberate indifference" was the moving

force behind the constitutional violation in this case because patrol officers cannot be expected to understand constitutional requirements "if the people at the very top of the chain of command do not." *Id.* at 9.

The Court has already rejected Mr. Long's claim that Chief Sauschuck failed to adequately evaluate whether Officer Abbott violated Mr. Long's constitutional rights. *See* Section IV.C. Mr. Long offers no additional facts that suggest the existence of a municipal policy or custom of deliberate indifference that caused the alleged constitutional violation. He presents no evidence of a grave risk of harm, the municipality's actual or constructive knowledge of that grave risk, or the municipality's failure to take easily available measures to address the risk. In short, Mr. Long has failed to provide a sufficient evidentiary basis to support a finding of municipal liability, and the Court therefore concludes that the City of Portland is entitled to summary judgment on Count III.

### D.    Qualified Immunity

"[Q]ualified immunity shields government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Matalon v. Hynnes*, 806 F.3d 627, 632–33 (1st Cir. 2015) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). "Even law enforcement officials who 'reasonably but mistakenly conclude that probable cause is present' are entitled to immunity." *Hunter v. Bryant*, 502 U.S. 224, 227 (1991) (quoting *Anderson v. Creighton,* 483 U.S. 635 (1987)). In other words, the doctrine protects "all but the plainly incompetent or those who

knowingly violate the law." *Alfano v. Lynch*, No. 16-1914, 2017 U.S. App. LEXIS 1794, at *4 (1st Cir. Feb. 1, 2017) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).

The qualified immunity analysis proceeds in two steps. *Alfano*, 2017 U.S. App. LEXIS 1794, at *5. First, the Court must determine whether the plaintiff's version of the facts makes out a violation of a protected right. *Id.* Second, the Court must determine "whether the right at issue was 'clearly established' at the time of defendant's alleged misconduct." *Id.* (quoting *Matalon*, 806 F.3d at 633). The "clearly established" analysis consists of two sub-parts. *Id.* (citing *MacDonald v. Town of Eastham*, 745 F.3d 8, 12 (1st Cir. 2014)). The first sub-part requires the plaintiff "to identify either 'controlling authority' or a 'consensus of cases of persuasive authority' sufficient to send a clear signal to a reasonable officer that certain conduct falls short of the constitutional norm." *Id.* at *5–6 (quoting *Wilson v. Layne*, 526 U.S. 603, 617 (1999)). The second sub-part asks "whether an objectively reasonable official in the defendant's position would have known that his conduct violated that rule of law." *Id.* at 6; *see also Mihos v. Swift,* 358 F.3d 91, 102 (1st Cir. 2004).

Because the Court has already determined that Chief Sauschuck is entitled to summary judgment on the merits, the Court limits its qualified immunity analysis to Officer Abbott. In this case, the Court has concluded that Officer Abbott is not entitled to summary judgment on the alleged wrongful arrest, unlawful search, and excessive use of force. A reasonable jury could find that Officer Abbott did not have probable cause to believe that Mr. Long was drinking in public or loitering and that Officer Abbott therefore did not have probable cause to search or arrest Mr. Long for

failing to provide identification. Likewise, a reasonable jury could find that Officer Abbott's use of force was unreasonable under all the circumstances. The Court therefore concludes that Mr. Long's version of the facts makes out a violation of Mr. Long's protected rights.

The second step of the analysis also favors of Mr. Long. With respect to the first sub-part, the Court determines that there is a clearly established and long-held right to be free from unreasonable searches or seizures without probable cause and the excessive use of force. *See Beck v. Ohio*, 379 U.S. 89 (1964); *Alfano*, 2017 U.S. App. LEXIS 1794, at *8 ("It is hornbook law that the Fourth Amendment requires probable cause to place an individual under arrest"); *Morelli*, 552 F.3d at 23 ("Our case law supplies a crystal clear articulation of the right, grounded in the Fourth Amendment, to be free from the use of excessive force by an arresting officer). The second sub-part is a closer call. The Court must determine "whether a similarly situated reasonable official would have understood that the challenged action violated the constitutional right at issue." *Mihos*, 358 F.3d at 102. That is, the Court must determine whether a reasonable official would have known that searching, arresting, and shoving Mr. Long under the circumstances of this case violated his Fourth Amendment rights.

### 1. Probable Cause to Arrest and Search

The Defendants point out that Mr. Long was seated near an open can of beer in a location where males were reported to be drinking in public and that Mr. Long refused to provide the officers with his name and date of birth. *Defs.' Mot.* at 16.

Accordingly, the Defendants contend that "[i]t is at least arguable…that Officer Abbott had probable cause for an arrest [for failure to provide identification] and that he was therefore justified in removing Mr. Long's wallet[.]"  *Id.*  The problem with this argument is that it assumes that a reasonable officer would understand that Mr. Long's mere proximity to an open beer can provided probable cause to believe Mr. Long was drinking in public.  Yet the public drinking statute is clear:  a person is guilty of drinking in public if the person drinks alcohol either (1) within 200 feet of a sign prohibiting drinking or (2) after being forbidden to do so personally by law enforcement.  17 M.R.S. § 2003-A(2).  A reasonable officer should therefore know that proximity to an alcoholic container, by itself, is insufficient to arrest an individual for public drinking.  *See Harlow*, 457 U.S. at 819 ("[A] reasonably competent public official should know the law governing his conduct").

There is no contention in this case that law enforcement officials previously forbade Mr. Long from drinking in public.  Hence, the focus of the Court's inquiry must be whether a reasonable officer in Officer Abbott's position could believe that Mr. Long was drinking in public within 200 feet of a sign prohibiting drinking.  As the Court discussed above, the existing record simply does not provide the Court with the ability to assess whether it was reasonable to believe there was a sign within 200 feet of 24 Preble Street.  Again, it may well be that a jury could conclude that a reasonable law enforcement official in Officer Abbott's position would have known that there was no sign within 200 feet.  In that case, any reasonable official would have understood that arresting and searching Mr. Long would violate his Fourth

Amendment rights.  Accordingly, the Court concludes that qualified immunity does not shield Officer Abbott from liability based on the offense of drinking in public.

The Defendants argue that Officer Abbott had probable cause to search and arrest Mr. Long not only because he was drinking in public, but also because he was loitering in violation of a Portland ordinance.  *Defs.' Mot.* at 6.  The Defendants do not mention loitering in their discussion of qualified immunity.  Nevertheless, the Court concludes that a reasonable official in Officer Abbott's position would have understood that arresting and searching Mr. Long based on the crime of loitering violated his Fourth Amendment rights.  Portland's loitering clearly establishes that an individual is guilty of loitering when that person loiters in a manner set forth in the ordinance and refuses to obey an officer's directive "to move on or disperse."  City of Portland, Me., Code of Ordinances § 17-1(c).  Hence, a reasonably competent official should know that the offense of loitering requires the official to first order the individual to vacate the area.  The record in this case clearly indicates that Officer Abbott never directed Mr. Long "to move on or disperse" before arresting him.  Because a similarly situated reasonable official would have understood that arresting and searching Mr. Long based on the offense of loitering violated the constitutional right at issue, qualified immunity does not shield Officer Abbott from liability.  Accordingly, Mr. Long's wrongful arrest and illegal search claims may proceed against Officer Abbott.

### 2.      Excessive Force

Analyzing an excessive force claim under the rubric of qualified immunity can be challenging because "[b]y definition, excessive force is unreasonable force." *Morelli*, 552 F.3d at 24. Yet as the First Circuit has acknowledged, "reasonable people sometimes make mistaken judgments, and a reasonable officer sometimes may use unreasonable force." *Id.* Qualified immunity thus serves to give "an officer the benefit of a margin of error." *Id.* The First Circuit has clarified that "qualified immunity is appropriate in an excessive force case when an officer 'correctly perceive[s] all of the relevant facts but [has] a mistaken understanding' as to the legality of his chosen level of force." *Id.* By contrast, "qualified immunity protection would not be available when the level of force chosen by the officer cannot in any way, shape, or form be justified under those facts." *Id.*

Viewing the facts in the light most favorable to Mr. Long, the Court concludes that Officer Abbott's conduct in this case falls "outside the universe of protected mistakes." *Id.* Officer Abbott suspected Mr. Long of drinking in public and loitering and arrested him on a relatively routine charge of failing to provide identification. Mr. Long was not resisting arrest, and there is no evidence that Officer Abbott believed Mr. Long was dangerous or posed a flight risk. A rational jury could find that shoving a restrained, compliant individual face first onto the stairs in these circumstances "eclipsed the bounds of reasonableness." *Id.* at 25. As such, the Court refuses to order summary judgment on Mr. Long's excessive force claim on the basis of qualified immunity.

### E. Count IV (Assault) and Count V (Unlawful Arrest)

In Counts IV and V, Mr. Long accuses Officer Abbott of assault and unlawful arrest, respectively.  Both causes of action arise under Maine statutory law.  *Fourth Am. Compl.* ¶¶ 78–85.  The MTCA requires that a claimant against a governmental entity file a written notice of claim within 180 days after the cause of action accrues.  14 M.R.S. § 8107(1).  The general purpose of the notice requirement is to "enable the governmental entity to investigate and evaluate claims for purposes of defense or settlement."  *Pepperman v. Barrett*, 661 A.2d 1124, 1126 (Me. 1995).  Notice of claims against an employee of a "political subdivision" must be addressed to "one of the persons upon whom a summons and complaint could be served under the Maine Rules of Civil Procedure, Rule 4."  14 M.R.S. § 8107(3).  This notice must include:

> A. The name and address of the claimant, and the name and address of the claimant's attorney or other representative, if any;
> B. A concise statement of the basis of the claim, including the date, time, place and circumstances of the act, omission or occurrence complained of;
> C. The name and address of any governmental employee involved, if known;
> D. A concise statement of the nature and extent of the injury claimed to have been suffered; and
> E. A statement of the amount of monetary damages claimed.

14 M.R.S. § 8107(1).

In this case, Mr. Long's tort claims arose at the time of his arrest on August 9, 2014.  To comply with the MTCA's 180-day deadline, Mr. Long needed to file a written notice of his claim on or before February 5, 2015.  Yet Mr. Long did not meet with Attorney Waxman until February 18, 2015, and it was not until February 20, 2015— fifteen days after the expiration of the notice deadline—that Attorney Waxman

mailed a letter to the PPD entitled "Notice of Claim Under 14 M.R.S.A. § 8107 and 14 M.R.S.A. § 1503." Mr. Long does not assert any good cause as to why he could not have filed the notice letter within the 180-day statutory limit. Nor would there have been a basis for such a claim. *See Porter v. Philbrick-Gates*, 2000 ME 35, ¶ 4, 745 A.2d 996 (interpreting "'good cause' to require a showing that the plaintiff was unable to file a claim or was meaningfully prevented from learning of the information forming the basis for his or her complaint"); *Witham v. Androscoggin Cty. Sheriff's Office*, No. 2:12-cv-00078-JAW, 2012 U.S. Dist. LEXIS 156844, at *20 (D. Me. Jul. 12, 2012). Indeed, the Maine Supreme Judicial Court has written that it has "interpreted the MTCA good cause exception narrowly, because . . . the MTCA is a statute in derogation of the common law." *Beaulieu v. Aube Corp.*, 2002 ME 79, ¶ 19, 796 A.2d 683. The Court concludes that Mr. Long's February 20, 2015 letter to the PPD failed to provide timely notice as required by the MTCA.

Mr. Long argues, however, that his December 4, 2014 letter to the PPD constituted "substantial compliance" with the MTCA and fell within the 180-day statutory deadline. *Pl.'s Resp.* at 12. On December 4, 2014, Mr. Long sent a letter addressed to Lieutenant Robert Martin, Internal Affairs, Portland Police Department. *Long Letter* at 31. The letter contains the following caption:

### COMPLAINT OF OFFICER AND DEPARTMENT CONDUCT

*Id.* at 31. It reads:

> Enclosed, please find my statement of fact in connection with my arrest of August 9, 2014, which I am submitting as a formal complaint against the arresting officer and against those individuals who may be either directly or indirectly involved in this matter.

62

*Id.* Attached to the December 4, 2014 letter was Mr. Long's eleven-paragraph description of the events leading to his arrest, largely consistent with the statement of facts set forth above. *Long Statement.* at 32–33.

The question is whether Mr. Long's December 4, 2014 letter to the PPD substantially complied with the notice provision of section 8107(1). The Court concludes it does not. Mr. Long is correct that the MTCA requires substantial, not perfect, notice compliance:

> No claim or action shall be commenced against a governmental entity or employee in the Superior Court unless the foregoing notice provisions are substantially complied with. A claim filed under this section shall not be held invalid or insufficient by reason of an inaccuracy in stating the time, place, nature or cause of the claim, or otherwise, unless it is shown that the governmental entity was in fact prejudiced thereby.

14 M.R.S. § 8107(4); *see also Steeves v. City of Rockland*, 600 F. Supp. 2d 143, 181–82 (D. Me. 2009). "The substantial compliance exception is properly invoked only when the notice, although timely filed or excused from timely filing because of good cause, is defective in some other respect such as the failure to satisfy the form requirements of § 8017(1)(A)–(E)." *Palm v. Sisters of Charity Health, Sys.*, 537 F. Supp. 2d 228, 231 (D. Me. 2008) (quoting *Erickson v. State,* 444 A.2d 345, 350 (Me. 1982)). The issue narrows to whether Mr. Long's December 4, 2014 letter includes mere "inaccuracies" of form, or whether the failures are "fundamental." *Id.* (citing *Faucher v. City of Auburn,* 465 A.2d 1120 (Me. 1983)).

The "substantial compliance" determination is fact intensive. *See id.* The Maine Law Court has had several opportunities to consider different factual

scenarios.  In general, where a plaintiff sends notice to an incorrect recipient and the notice contains other significant imperfections, the Law Court has not allowed the claims to stand.  *See, e.g.*, *Pepperman*, 661 A.2d at 1126 (Me. 1995) (holding that a letter did not substantially comply with the MTCA's notice requirement because the letter was not addressed to the appropriate agency, did not contain a "hint of the property damage or emotional distress" alleged by the plaintiff, and did not mention any monetary damages); *Hall v. Kittery*, 556 A.2d 662 (Me. 1989) (holding that the plaintiff failed to satisfy the notice requirement because the plaintiff did not serve the notice on a proper town official and because the notice did not include the amount of monetary damages claimed); *see also McCarthy v. Inhabitants of Town of Kennebunkport*, 366 F. Supp. 2d 165, 168 (D. Me. 2005) (holding that a letter did not constitute substantial compliance because the plaintiff failed to give notice to a designated person under the MTCA and because it did not "include a concise statement of the nature and extent of [the plaintiff's] injury); *cf. Robinson v. Washington County*, 529 A.2d 1357 (Me. 1987) (holding that a notice that was sufficient in all other respects substantially complied with the MTCA even though the plaintiff served the real party in interest and not a person designated under the MTCA).

Based on this caselaw, the Court concludes that Mr. Long's December 4, 2014 letter does not constitute substantial compliance.  First, Mr. Long failed to send the letter to an appropriate person under the MTCA.  As Officer Abbott was an employee of the city of Portland, the MTCA required Mr. Long to file notice with a person "upon

64

whom a summons and complaint could be served under the Maine Rules of Civil Procedure, Rule 4, in a civil against [the city of Portland]."  14 M.R.S. § 8107(3)(B). Consequently, Mr. Long needed to file notice with the clerk, treasurer, or manager of the city of Portland.  *See* ME. R. CIV. P. 4(d)(6) ("Personal service within the state shall be made as follows: (6) Upon a city, by delivering a copy of the summons and of the complaint to the clerk, treasurer, or manager").

Mr. Long addressed his letter to Lieutenant Martin of the Internal Affairs Division of the PPD, and there is no evidence in the record that Lieutenant Martin also served as a city clerk, treasurer, or manager or was otherwise authorized to receive service of process on behalf of the city of Portland.  In *Faucher v. City of Auburn*, 465 A.2d 1120 (Me. 1983), the Maine Law Court cited Maine Rule of Civil Procedure 4(d)(6) in rejecting a notice that a minor's mother had given to a teacher and to a school principal; the *Faucher* Court explained that the purpose of the requirement that notice is given to a proper Rule 4(d)(6) recipient is "to assure that the notice will be received by an official having authority to deal with plaintiff's claim or that the official receiving notice is one charged with the duty of transmitting the notice to the proper officials."  *Id.* at 1123.  Here, as in *Faucher*, notice to someone other than the Rule 4(d)(6) personnel was "clearly not in compliance with the statute." *Id.*

Even so, *Robinson* makes clear that sending notice to an incorrect recipient does not, by itself, bar a plaintiff's claims under the MTCA.  However, the letter suffers from additional deficiencies.  For instance, the letter does not include a

65

statement of the amount of monetary damages claimed.  14 M.R.S. § 8107(1)(E).  In this way, the case closely resembles *Hall*, where the Law Court held that the plaintiffs did not meet the MTCA's notice requirement because they did not serve notice on the proper official and because the notice did not include the amount of monetary damages claimed.  556 A.2d at 663–64.

Additionally, although Mr. Long's letter describes the "date, time, place and circumstances" of the events of August 9, 2014, 14 M.R.S. § 8107(1)(B), the letter never provides a "concise statement of the nature and extent of the injury claimed to have been suffered."  Nowhere does the letter refer to an "assault," "unlawful arrest," or "claim," nor does it "purport[] to notify [Officer Abbott] of [Mr. Long's] intention to bring a civil action" again him.  *See Hall*, 556 A.2d at 663–664 (quoting *Robinson*, 529 A.2d at 1360) (alteration added).  Indeed, Mr. Long does not mention any injuries or damages he sustained as a result of the incident.  *Long Statement* at 32–33.  Rather, it strikes the Court that Mr. Long intended the letter as way to notify the Internal Affairs officer of the PPD of what he perceived as Officer Abbott's unprofessional conduct so that Lieutenant Martin could perform an internal investigation of Officer Abbott's conduct.  The fact that Mr. Long addressed the letter to "Internal Affairs" and entitled his letter "Complaint of Officer and Department Conduct" supports the Court's interpretation.

It is also telling to contrast Mr. Long's December 4, 2014 letter with the "Notice of Claim" that Attorney Waxman mailed on February 20, 2015—fifteen days after the 180-day deadline.  Like the December 4, 2014 letter, the Notice of Claim includes the

name and address of the claimant, as well as a statement of the circumstances of the case. However, the Notice of Claim additionally includes the name of Mr. Long's attorney, the name of the governmental employee involved in the case, a description of the nature and extent of the injuries, and an explanation that the monetary damages were not yet discernable. In addition, the Notice of Claim explicitly states that it is intended to "give [the Defendants] an understanding of the claims that Mr. Long intends to bring," *Pl.'s Resp. to Req. for Prod.* at 8, and mentions wrongful arrest, bodily injury, emotional distress, and violations of Mr. Long's civil rights. *Id.* at 9.

In short, the February 20, 2015 Notice of Claim complies with the strictures of the MTCA; the December 4, 2014 letter does not. Again, the general purpose of the notice requirement is to "enable the governmental entity to investigate and evaluate claims for purposes of defense or settlement." *Pepperman*, 661 A.2d at 1126. The shortcomings of December 4, 2014 letter with respect to the MTCA make it difficult for a recipient to understand that a claim is forthcoming, much less to investigate and evaluate a potential lawsuit as opposed to a request for an internal investigation. In fact, the officer investigating Mr. Long's complaint to Internal Affairs concluded from the letter that Mr. Long was concerned with Officer Abbott's use of profane language and excessive force, not—as the later Notice of Claim and civil complaint made clear—"wrongful arrest," "emotional distress," "bodily injury," "assault," or other civil rights violations. The Court concludes that neither Mr. Long's December 4, 2014 letter, nor his belated February 20, 2015 Notice of Claim, complied with the MTCA, and Mr. Long's state law claims of assault and unlawful arrest are barred.

67

## VI.    CONCLUSION

The Court GRANTS summary judgment to Chief Michael Sauschuck and the City of Portland as to Counts II and III and to Officer Brent Abbott as to Counts IV and V.  The Court DENIES summary judgment as to Count I of the Defendants' Motion for Summary Judgment (ECF No. 30).

SO ORDERED.

/s/ John A. Woodcock, Jr.
JOHN A. WOODCOCK, JR.
UNITED STATES DISTRICT JUDGE

Dated this 1st day of March, 2017